IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

MICHAEL T. WASHINGTON,   :
            :
    Petitioner,   :
            :
  v.        :  Civil Action No. 17-601-CFC
            :
ROBERT MAY, Warden, and  :
ATTORNEY GENERAL OF THE :
STATE OF DELAWARE,   :
            :
    Respondents.  :

_____

Michael T. Washington. *Pro se* Petitioner.

Carolyn S. Hake, Deputy Attorney General of the Delaware Department of Justice, Wilmington, Delaware.  Attorney for Respondents.

_____

## **MEMORANDUM OPINION**[1]

September 30, 2022
Wilmington, Delaware

_____

[1]This case was reassigned from the Honorable Richard G. Andrews' docket to the undersigned's docket on February 27, 2019.

CONNOLLY, CHIEF JUDGE:

Petitioner Michael T. Washington has filed a Petition and an Amended Petition

for a Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 ("Petition").  (D.I. 1; D.I. 69)

The State filed an Answer in opposition, to which Petitioner filed a Reply.  (D.I. 77; D.I.

80)  For the reasons discussed, the Court will deny the Petition.

## I.    BACKGROUND

### A.  Factual History

It appears from the record that Francis and Guy were found shot to death on September 1, 2008 (hereinafter "the shooting") in the front seat of a bullet-ridden black Lexus (hereinafter "the vehicle") in the 500 block of E. 10th Street. The first police officer to arrive at the scene found the vehicle stopped in the middle of traffic, still in gear and wedged against another car.

Detective John Ciritella of the Wilmington Police Department (hereinafter "Ciritella") was assigned to investigate the shooting.  As the investigation unfolded, Ciritella theorized that the shooting occurred from inside the vehicle as it was leaving the 700 block of E. 10th Street and that the vehicle continued moving until it came to a stop in the 500 block.

Ciritella recovered a significant number of bullets, bullet fragments and/or shell casings, from the interior of the vehicle, the 700 block of E. 10th Street, and the victims' bodies following the medical examiner's autopsies. Ciritella did not, however, recover a weapon that was used in the shooting.

At trial, Ciritella testified that initially and for several months after the shooting, he could not develop a lead on a suspect. Finally, however, in April 2009, Ciritella was advised that an inmate in federal custody, Christopher Waterman, was interested in disclosing information about the shooting that he had allegedly heard from another inmate. The other inmate turned out to be [Petitioner]. Similarly, in May 2009 and December 2009, Ciritella learned that inmates William Coleman and Isaiah Fields also wanted to disclose information that another inmate, again [Petitioner],

purportedly told each of them about the shooting. Ciritella conducted individual one-on-one interviews with Waterman, Coleman and Fields. As a result of those interviews, Ciritella learned that between the fall of 2008 and the spring of 2009, [Petitioner] allegedly individually told Waterman, Coleman and Fields at different times that he was either in the vehicle during the shooting or that he was the shooter, and that the weapon involved in the shooting was a "Mac 10," which Ciritella knew was a candidate weapon. Ciritella also learned from Waterman, Coleman and Fields that the shooting was possibly the result of a botched robbery or a dispute over a drug deal, and that the gun had discharged unexpectedly in the vehicle.

Ciritella learned additional information from Coleman about [Petitioner's] possible involvement in the shooting, namely that [Petitioner] was worried that a resident of the 700 block of E. 10th Street, April Gardner, had witnessed the shooting. Moreover, Fields told Ciritella that he was with [Petitioner] in June or July 2008 at 930 Spruce Street, a drug hangout, when the "Mac 10" [Petitioner] was holding suddenly went off and sprayed gunfire.

As a result of his interview with Fields, Ciritella obtained a search warrant for 930 Spruce Street and in the ensuing search found a number of bullet holes in the floor and walls from which he recovered three bullets. From his interview with Coleman, Ciritella was able to locate Gardner at her 729 E. 10th Street home. Gardner told Ciritella that she witnessed the events leading to the shooting on September 1, 2008 from the front steps of her home.

At trial, Gardner testified that, prior to the shooting, she was outside sitting on her front steps watching her grandson ride his bicycle when she observed [Petitioner] and another male—later identified as Guy—walking down 10th Street. Gardner told the jury that she knew [Petitioner] because he had grown up in the neighborhood and had gone to school with her children.

Gardner testified that she observed [Petitioner] and his companion approach another man who was sitting in the driver's seat of a vehicle that was parked directly in front of her house. According to Gardner, after the three men

3

conversed briefly, Guy got into the right front passenger seat of the vehicle and [Petitioner] got into the right rear passenger seat.

Gardner testified that moments after the two men entered the vehicle the vehicle's windows "erupted." Shocked by the explosion, Gardner said, she immediately "grabbed [her] grandson" and ran to her daughter's house around the corner on Bennett Street where she remained for several hours before returning home. Gardner testified that as she ran from the scene, she could feel shards of glass getting caught in her hair, and that she had "glass all in [her] hair" when she reached her daughter's house. Gardner further testified that [Petitioner] came to her home later that evening "to apologize," but that she refused to speak to him.

On September 28, 2009, [Petitioner] was charged with two counts of Murder in the First Degree, two counts of Possession of a Firearm During the Commission of a Felony and one count of Possession of a Firearm by a Person Prohibited. [Petitioner] went to trial on those charges on October 26, 2010.

At trial, the State's ballistics expert, Delaware State Police Firearms Examiner Carl Rone (hereinafter "Rone"), opined that the strafing of the vehicle's interior was the result of a semi-automatic or automatic weapon discharging more than thirty rounds inside the vehicle from the area of the right rear passenger seat. Rone further opined that the sixteen bullets and thirty spent shell casings he examined, which were recovered from the vehicle, the victims' bodies, and 930 Spruce Street, all came from the same semi-automatic or automatic weapon.

[Petitioner] testified at trial that he visited "Miss April" later in the evening on September 1, 2008, because he was sorry to hear that Leighton and Francis had been shot in front of her house, and that she had witnessed the shooting. [Petitioner] also testified that, a few days prior to the shooting, he had a conversation with Leighton and Guy, while in the vehicle, about a gun his cousin wanted to sell. According to [Petitioner], the gun he was helping his cousin sell "hold[s] 30 rounds" and was "the same gun that went off in the house [on] 930 Spruce Street." [Petitioner] denied any involvement in the

4

> shooting, however, and he testified that at the time of the shooting he was "cooking up some drugs" at 930 Spruce Street.

*Washington v. State*, 31 A.3d 77 (Table), 2011 WL 4908250, at *1-2 (Del. October 14, 2011).

### B. Procedural History

On September 28, 2009, a New Castle County grand jury charged Petitioner by indictment with two counts of first degree murder, two counts of attempt first degree robbery, two counts of possession of a firearm during the commission of a felony ("PFDCF"), and one count of possession of a firearm by a person prohibited ("PFBPP"). (D.I. 76-1 at Entry No. 1;1 D.I. 47-3 at 1-4) On November 11, 2010, a Delaware Superior Court jury found Petitioner guilty of two counts of the lesser-included offense of manslaughter and two counts of PFDCF. (D.I. 76-1 at Entry No. 41) The jury found Petitioner not guilty of the attempted robbery charges. (*Id.*) On February 11, 2011, the Superior Court sentenced Petitioner to an aggregate of eighty-six years of imprisonment at Level V, suspended after sixty-six years for decreasing levels of supervision. (D.I. 76-1 at Entry No. 48) The Delaware Supreme Court affirmed Petitioner's conviction on direct appeal. *See Washington*, 2011 WL 4908250, at *4.

In March 2012, Petitioner filed a *pro se* motion for postconviction relief pursuant to Delaware Superior Court Criminal Rule 61 motion (interchangeably referred to as "Rule 61 motion" or "first Rule 61 motion"). (D.I. 76-3) He filed an amended Rule 61 motion on August 8, 2012 (also interchangeably referred to as "Rule 61 motion" or "first Rule 61 motion"). (D.I. 47-1 at Entry No. 77) Defense counsel filed Rule 61 affidavits in

response to Petitioner's Rule 61 motion.  (D.I. 47-1 at Entry Nos. 81, 82)  The State filed

a response to the Rule 61 motion on October 31, 2012.  (D.I. 47-22)  The Superior

Court appointed post-conviction counsel to represent Petitioner during his Rule 61

proceeding.  (D.I. 76-1 at Entry Nos. 99-101, 139, 140)   Thereafter, the Superior Court

sequentially appointed three substitute postconviction counsel.  (D.I. 76-1 at Entry Nos.

110, 112, 115, 120)  On July 17, 2015, Petitioner's last appointed post-conviction

counsel concluded that there were no meritorious issues he could advocate on

Petitioner's behalf and filed a motion to withdraw as counsel.  (D.I. 76-1 at Entry No

125)  Petitioner responded to the motion withdraw, and the Superior Court ordered post-

conviction counsel to file an affidavit outlining the work he had performed.  (D.I. 76-1 at

Entry Nos. 127, 129)  Post-conviction counsel filed his letter affidavit on November 15,

2015.  (D.I. 76-1 at Entry No. 146)

Petitioner requested, and was granted, an extension of time to file an amended

*pro se* Rule 61 motion after consulting with a private investigator.  (D.I. 76-1 at Entry

Nos. 131-136, 138)  Petitioner filed amendments to his Rule 61 motion in March 2016,

which consisted of three new claims (also interchangeably referred to as "Rule 61

motion" or "first Rule 61 motion").  (D.I. 76-1 at Entry No. 139, 140)  Although the State

was provided an opportunity to respond to Petitioner's amendments, (D.I. 47-1 at Entry

No. 141), it did not file a response.

On September 27, 2016, a Superior Court Commissioner issued a report

recommending that Petitioner's Rule 61 motion—consisting of the original March 2012

Rule 61 motion and Petitioner's March 2016 amendments—be denied and that post-

6

conviction counsel's motion to withdraw be granted.  *See State v. Washington*, 2016 WL

5407852 (Del. Super. Ct. Sept. 27, 2016).  The Superior Court adopted that Report and

Recommendation on October 19 2016, denied Petitioner's Rule 61 motion, and granted

post-conviction counsel's motion to withdraw.  *See Sate v. Washington*, 2016 WL

6248462 (Del. Super. Ct. Oct. 19, 2016), corrected Oct. 21, 2016.  The Delaware

Supreme Court affirmed that decision on April 28, 2017.  *See Washington v. State*, 164

A.3d 56 (Table), 2017 WL 1573119 (Del. Apr. 28, 2017).

Petitioner filed his original Petition for habeas relief on May 24, 2017.  (D.I. 1)

The Court ordered the State to answer the Petition on November 7, 2017.  (D.I. 16)

On November 21, 2017, Petitioner moved to stay these proceedings, requesting,

without elaboration, permission to pursue a claim of "actual innocence" in the state

courts in order to exhaust state remedies, and asking to compel the State to release

evidence of out of court Jencks Act statements.  (D.I. 18)  On November 30, 2017,

Petitioner moved to amend or supplement his motion to stay.  (D.I. 21)  On January 9,

2018—before the State's answer to Petitioner's habeas Petition was due—Petitioner

filed another motion to amend or supplement his Petition (D.I. 26), and the Court

ordered Respondents to respond to Petitioner's motion to stay the proceedings rather

than answer the habeas Petition. (D.I. 27) On January 11, 2018, the State responded to

Petitioner's motion to stay, and Petitioner filed a habeas corpus "brief."  (D.I. 28; D.I. 29)

On January 29, 2018, the Court denied Petitioner's motions to stay, to compel, to

appoint counsel, and for an evidentiary hearing, and granted Petitioner's motion to

amend or supplement his Petition.  (D.I. 31; D.I.  32)  On February 21, 2018, Petitioner

7

supplemented his habeas Petition. (D.I. 34)  On March 20, 2018, Petitioner filed a

motion for reconsideration of the Court's order denying the motion to stay. (D.I. 36)  On

October 22, 2018, the Court denied Petitioner's motion for reconsideration and ordered

the State to respond to Petitioner's amended Petition. (D.I. 43)  On November 13, 2018,

before the State filed its answer to Petitioner's habeas Petition, Petitioner filed a motion

for an evidentiary hearing and/or to stay due to newly discovered evidence.  (D.I. 46)

The State filed an Answer on January 7, 2019. (D.I. 47-50)  Petitioner filed a Reply on

January 18, 2019. (D.I. 52)

On April 30, 2019, Petitioner again moved to stay these federal proceedings

in order to "argue . . . newly discovered evidence [*i.e.*, challenges to the reliability and

credibility of the State's expert ballistic witness, recantations by one of the

State's witnesses, and newly presented witness statements] in the Superior Court in

order to properly exhaust his remedies and avoid any procedural[] issue[s] . . . in this

district court." ( D.I. 57)   On July 8, 2019, the Court ordered the State to respond to

Petitioner's motions for an evidentiary hearing and to stay.  (D.I. 59)   Although the State

opposed Petitioner's Motions, it "respectfully requested" that, if the Court did not outright

deny the motions, "the case [should] be stayed for [Petitioner] to exhaust his 'newly

discovered' evidence claims in the state courts." (D.I. 60 at 18)  Subsequently, on

August 21, 2019, the Court denied Petitioner's motion for an evidentiary hearing, but

granted Petitioner's motion to stay the matter for Petitioner to exhaust his "newly

discovered evidence" claims in the state courts.  (D.I. 64)

8

On August 30, 2019, Petitioner filed his second *pro se* Rule 61 motion and a motion for appointment of counsel in the Superior Court.  (D.I. 76-8 at 157-160, 161-164)  On September 9, 2019, the Superior Court directed the appointment of counsel to represent Petitioner.  (D.I. 76-8 at 165-167)  On April 28, 2020, Petitioner filed a counseled amended second Rule 61 motion, claiming that three pieces of "new evidence" establish Petitioner's "actual innocence," warranting a new trial: (1) State witness Christopher Waterman recanted his testimony; (2) State witness Isaiah Fields was the beneficiary of an undisclosed tacit sentence reduction agreement, resulting in a *Brady v. Maryland*, 373 U.S. 83 (1963) violation; and (3) the State's expert ballistics witness Carl Rone misled the jury by misrepresenting his credentials, and used unreliable and subjective methods of identification. (D.I. 76-9 at 6-67)  The Superior Court denied Petitioner's claims, finding that his second Rule 61 motion was procedurally barred under Rule 61(i)(1) and (2) as untimely and successive, that his claims regarding Fields and Rone were also procedurally defaulted under Rule 61(i)(3), and that Petitioner failed to establish a strong inference of actual innocence to overcome the bars.  *See State v. Washington*, 2021 WL 5232259, at *6-9 (Del. Super. Ct. Nov. 9, 2021).  Petitioner appealed and, on April 7, 2022, the Delaware Supreme Court affirmed the Superior Court's denial of his second Rule 61 motion.  *See Washington v. State*, 275 A.3d 1258 (Table), 2022 WL 1041267 (Del. Apr. 7, 2022).  On May 20, 2022, Petitioner filed a motion to set aside judgment under Delaware Superior Court Civil Rules 60(b)(1), (3), and (6) and 55(c), asking the Superior Court to set aside its "default" judgment denying him postconviction relief and grant him a new trial, and a

motion to amend supplement to include a reference to Superior Court Criminal Rule 57(d).  (D.I. 76-12, 76-13)  On May 24, 2022, the Superior Court deemed Petitioner's motion to set aside judgment as a third Rule 61 motion, summarily dismissed the motion as procedurally barred, and held that Petitioner's motion to amend and supplement was moot.  *See State v. Washington*, 2022 WL 1656008, at *2-3 (Del. Super. Ct. May 24, 2022).  The Delaware Supreme Court affirmed the Superior Court's decision on September 6, 2022.  *See Washington v. State*, 2022 WL 4088664, at *1 (Del. Sept. 6, 2022).

Before he filed his third Rule 61 motion in the Superior Court in May 2022, Petitioner notified this Court on April 14, 2022 that he had competed his state post-conviction proceedings, and moved to amend, expand, and supplement his habeas petition to include "3 new claims [that he] ... exhaust[ed] ... in the [state] court[s] (D.I. 66); Petitioner filed an amended habeas petition on April 28, 2022 (D.I. 69).  On May 23, 2022, the Court lifted the stay and ordered the State to respond to the amended habeas Petition.  (D.I. 71)  Subsequently, on June 7, 2022, Petitioner supplemented his amended habeas Petition. (D.I. 72)  On June 29, 2022, the Court granted the State's motion for an extension of time to respond until August 12, 2022.  (D.I. 75)  The State filed its Answer on August 12, 2022 (D.I. 77), and Petitioner filed his Reply on August 30, 2022.  (D.I. 80)

## II.    GOVERNING LEGAL PRINCIPLES

### A. The Antiterrorism and Effective Death Penalty Act of 1996

Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) "to reduce delays in the execution of state and federal criminal sentences . . .

10

and to further the principles of comity, finality, and federalism." *Woodford v. Garceau*, 538 U.S. 202, 206 (2003). Pursuant to AEDPA, a federal court may consider a habeas petition filed by a state prisoner only "on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Additionally, AEDPA imposes procedural requirements and standards for analyzing the merits of a habeas petition in order to "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002).

### B. Exhaustion and Procedural Default

Absent exceptional circumstances, a federal court cannot grant habeas relief unless the petitioner has exhausted all means of available relief under state law. *See* 28 U.S.C. § 2254(b); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842-44 (1999); *Picard v. Connor*, 404 U.S. 270, 275 (1971). AEDPA states, in pertinent part:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that—
>
> (A) the applicant has exhausted the remedies available in the courts of the State; or
>
> (B)(i) there is an absence of available State corrective process; or (ii) circumstances exist that render such process ineffective to protect the rights of the applicant.

28 U.S.C. § 2254(b)(1). This exhaustion requirement, based on principles of comity, gives "state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan*, 526 U.S. at 844-45; *see Werts v. Vaughn*, 228 F.3d 178, 192 (3d Cir. 2000).

11

A petitioner satisfies the exhaustion requirement by demonstrating that the habeas claims were "fairly presented" to the state's highest court, either on direct appeal or in a post-conviction proceeding, in a procedural manner permitting the court to consider the claims on their merits.  *See Bell v. Cone*, 543 U.S. 447, 451 n.3 (2005); *Castille v. Peoples,* 489 U.S. 346, 351 (1989).  If the petitioner raised the issue on direct appeal in the correct procedural manner, the claim is exhausted and the petitioner does not need to raise the same issue again in a state post-conviction proceeding.  *See Lambert v. Blackwell,* 134 F.3d 506, 513 (3d Cir. 1997).

If a petitioner presents unexhausted habeas claims to a federal court, and further state court review of those claims is barred due to state procedural rules, the federal court will excuse the failure to exhaust and treat the claims as exhausted.  *See Coleman v. Thompson*, 501 U.S. 722, 732, 750-51 (1991) (such claims "meet[] the technical requirements for exhaustion" because state remedies are no longer available); *see also Woodford v. Ngo*, 548 U.S. 81, 92-93 (2006).  Such claims, however, are procedurally defaulted.  *See Coleman*, 501 U.S. at 749; *Lines v. Larkins*, 208 F.3d 153, 160 (3d Cir. 2000).  Similarly, if a petitioner presents a habeas claim to the state's highest court, but that court "clearly and expressly" refuses to review the merits of the claim due to an independent and adequate state procedural rule, the claim is exhausted but procedurally defaulted.  *See Coleman*, 501 U.S. at 750*; Harris v. Reed*, 489 U.S. 255, 260-64 (1989).

Federal courts may not consider the merits of procedurally defaulted claims unless the petitioner demonstrates either cause for the procedural default and actual

Case 1:17-cv-00601-CFC   Document 82   Filed 09/30/22   Page 13 of 73 PageID #: 6652

prejudice resulting therefrom, or that a fundamental miscarriage of justice will result if the court does not review the claims. *See McCandless v. Vaughn,* 172 F.3d 255, 260 (3d Cir. 1999); *Coleman,* 501 U.S. at 750-51. To demonstrate cause for a procedural default, a petitioner must show that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier,* 477 U.S. 478, 488 (1986). To demonstrate actual prejudice, a petitioner must show that the errors during his trial created more than a possibility of prejudice; he must show that the errors worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Id.* at 494.

Alternatively, if a petitioner demonstrates that a "constitutional violation has probably resulted in the conviction of one who is actually innocent,"[2] then a federal court can excuse the procedural default and review the claim in order to prevent a fundamental miscarriage of justice. *See Edwards v. Carpenter,* 529 U.S. 446, 451 (2000); *Wenger v. Frank,* 266 F.3d 218, 224 (3d Cir. 2001). The miscarriage of justice exception applies only in extraordinary cases, and actual innocence means factual innocence, not legal insufficiency. *See Bousley v. United States,* 523 U.S. 614, 623 (1998); *Murray,* 477 U.S. at 496. A petitioner establishes actual innocence by asserting "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial," showing that no reasonable juror would have voted to find the petitioner guilty beyond a reasonable doubt. *Hubbard v. Pinchak,* 378 F.3d 333, 339-40 (3d Cir. 2004).

---

[2]*Murray,* 477 U.S. at 496.

13

### C. Standard of Review

If a state's highest court adjudicated a federal habeas claim on the merits, the federal court must review the claim under the deferential standard contained in 28 U.S.C. § 2254(d). Pursuant to § 2254(d), federal habeas relief may only be granted if the state court's decision was "contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States," or the state court's decision was an unreasonable determination of the facts based on the evidence adduced in the trial. § 2254(d)(1) & (2); *see also Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Appel v. Horn*, 250 F.3d 203, 210 (3d Cir. 2001). A claim has been "adjudicated on the merits" for the purposes of § 2254(d) if the state court decision finally resolves the claim on the basis of its substance, rather than on a procedural or some other ground. *See Thomas v. Horn*, 570 F.3d 105, 115 (3d Cir. 2009). The deferential standard of § 2254(d) applies even "when a state court's order is unaccompanied by an opinion explaining the reasons relief has been denied." *Harrington v. Richter*, 562 U.S. 86, 98 (2011). As the Court explained in *Harrington*, "it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Id.* at 99.

Finally, when reviewing a habeas claim, a federal court must presume that the state court's determinations of factual issues are correct. *See* § 2254(e)(1). This presumption of correctness applies to both explicit and implicit findings of fact, and is only rebutted by clear and convincing evidence to the contrary. *See* § 2254(e)(1); *Campbell v. Vaughn*, 209 F.3d 280, 286 (3d Cir. 2000); *Miller-El v. Cockrell*, 537 U.S.

322, 341 (2003) (stating that the clear and convincing standard in § 2254(e)(1) applies to factual issues, whereas the unreasonable application standard of § 2254(d)(2) applies to factual decisions).

## III.   DISCUSSION

Petitioner asserts the following twenty-three Claims in his timely-filed Petition: (1) defense counsel was ineffective by failing to move to suppress the out-of-court statements of two State witnesses (D.I. 1 at 5; D.I. 29 at 15, 28); (2) the State engaged in prosecutorial misconduct by manipulating facts and misleading the jury as to the conditions of Christopher Waterman's federal plea agreement (D.I. 1 at 7); (3) the State engaged in prosecutorial misconduct by manipulating evidence and vouching for state witnesses (D.I. 1 at 8; D.I. 29 at 12, 14, 31); (4) the trial court committed plain error by permitting Detective Ciritella to testify as an expert (D.I. 1 at 10; D.I. 29 at 24, 25); (5) (a) the State engaged in prosecutorial misconduct during summation; and (b) defense counsel provided ineffective assistance by not objecting to the misconduct (D.I. 1 at 12); (6) the State engaged in prosecutorial misconduct relating to a ballistics argument (D.I. 1 at 14; D.I. 29 at 11); (7) (a) the trial court abused its discretion by dismissing the State's ballistics expert witness, Carl Rone, before Petitioner had the opportunity to view the vehicle involved in the incident and cross-examine Rone; and (b) defense counsel provided ineffective assistance by failing to ask certain questions while cross-examining Rone (D.I. at 16); (8) defense counsel provided ineffective assistance by failing to have DNA evidence tested (D.I. 1 at 18; D.I. 29 at 35); (9) defense counsel provided ineffective assistance by failing to correct the alleged misrepresentations about

15

Waterman's federal plea agreement (D.I. 1 at 20); (10) (a) defense counsel provided ineffective assistance by failing to object to the State's allegedly false statements of witness testimony during closing; (b) defense counsel provided ineffective assistance by failing to object to the State's "vouching" and assertion of personal belief/opinion during closing; and (c) defense counsel failed to perform an adversarial test that could prove Petitioner's innocence (D.I. 1 at 22; D.I. 29 at 13, 20, 31); (11) defense counsel provided ineffective assistance by failing to re-call the State's ballistics expert witness (Carl Rone) to ask questions Petitioner wanted asked after the jury viewed the vehicle involved in the shooting (D.I. 1 at 24); (12) defense counsel provided ineffective assistance by: (a) failing to perform an adversarial test that could have proven Petitioner innocent; (b) discredit a witness' testimony regarding a prior bad act; and (c) failing to object to Detective Ciritella testifying as an expert (D.I. 1 at 26; D.I. 29 at 18, 20, 22); (13) defense counsel provided ineffective assistance by failing to object or move to suppress evidence, which was allegedly unsupported by facts and not testified to by the State's expert witness (D.I. 1 at 28; D.I. 29 at 22, 28); (14) (a) defense counsel was ineffective for failing to disclose to [Petitioner] an alleged conflict of interest and that he had a fatal illness; and (b) the trial court failed to investigate the alleged conflict of interest (D.I. 1 at 30; D.I. 29 at 32); (15) postconviction counsel was ineffective for failing to raise Petitioner's claims, failing to investigate beyond the trial record and "recover imperative evidence outside of the trial transcripts" in order to show Petitioner's innocence, failing to provide Petitioner with an investigator to help prove his innocence, failing to properly advise Petitioner about the standard for postconviction relief and

16

inform Petitioner that his prosecutorial misconduct claims were procedurally barred and should be raised as ineffective assistance of trial counsel claims instead, and moving to withdraw from the case rather than helping to prove that trial counsel was ineffective (D.I. 1 at 32; D.I. 29 at 10, 25; D.I. 34 at 2-9; D.I. 69 at 8, 13-14, 16); (16) defense counsel was ineffective by failing to adequately cross-examine State witness Coleman (D.I. 29 at 17); (17) defense counsel was ineffective by failing to retain an expert on behalf of the defense to perform trajectory testing of the shooting inside the vehicle (D.I. 29 at 35); (18) defense counsel was ineffective by failing to investigate beyond the trial record and subpoena potential witnesses (D.I. 34 at 7; D.I. 29 at 12, 17, 19, 21, 30, 34, 36); (19) defense counsel was ineffective for failing to seek a reduction in sentence (D.I. 29 at 36); (20) appellate counsel was ineffective by filing a motion to withdraw from Petitioner's direct appeal (D.I. 29 at 36); (21) (a) the State committed a *Brady* violation because State witness Isaiah Fields was the beneficiary of an undisclosed tacit sentence reduction agreement, the nondisclosure of which Petitioner claims violated his Sixth and Fourteenth Amendment rights (D.I. 69 at 13-16); (b) defense counsel was ineffective "for failing to protect and/or raise" the alleged *Brady* violation concerning Fields" on direct appeal (D.I. 69 at 13-16; D.I. 72 at 2-5); and (c) post-conviction counsel was ineffective for failing to raise the *Brady* violation in Petitioner's first Rule 61 motion (D.I. 69 at 13-16; D.I. 72 at 2-5); (22) (a) trial counsel was ineffective "for failing to 'adequately' cross-examine State's ballistic expert witness 'Carl Rone' as to his certifications" and findings about the bullets and casing; and (b) postconviction counsel was ineffective for failing to investigate and raise defense

counsel's ineffectiveness with respect to Carl Rone (D.I. 69 at 24, 27-28); and (23) Petitioner has "new evidence" of his actual innocence based on Waterman's recantation, Fields' allegedly undisclosed "tacit" sentence reduction agreement, and Rone's qualifications and methodology (D.I. 69 at 21, 27).

### A. Exhausted Ineffective Assistance of Counsel Claims: Claims One, Five (b), Seven (b), Ten (a), and Eleven

Petitioner presented Claims One, Five (b), Seven (b), Ten (a), and Eleven in his Rule 61 motion. The Superior Court denied the Claims as meritless, and the Delaware Supreme Court affirmed that decision. Therefore, Claims One, Five (b), Seven (b), Ten (a), and Eleven will only warrant relief if the Delaware Supreme Court's decision was either contrary to, or an unreasonable application of clearly established federal law.

The clearly established Supreme Court precedent governing ineffective assistance of counsel claims is the two-pronged standard enunciated by *Strickland v. Washington*, 466 U.S. 668 (1984) and its progeny. *See Wiggins v. Smith*, 539 U.S. 510 (2003). Under the first *Strickland* prong, a petitioner must demonstrate that "counsel's representation fell below an objective standard of reasonableness," with reasonableness being judged under professional norms prevailing at the time counsel rendered assistance. *Strickland*, 466 U.S. at 688. Under the second *Strickland* prong, a petitioner must demonstrate "there is a reasonable probability that, but for counsel's error the result would have been different." *Id.* at 687-96. A reasonable probability is a "probability sufficient to undermine confidence in the outcome." *Id.* at 688. A court may choose to address the prejudice prong before the deficient performance prong, and may reject an ineffectiveness claim solely on the ground that the movant was not prejudiced.

18

*See Strickland*, 466 U.S. at 668.  Although not insurmountable, the *Strickland* standard is highly demanding and leads to a strong presumption that counsel's representation was professionally reasonable. *See id.* at 689.

Turning to the first prong of the § 2254(d)(1) inquiry, the Court notes that the Delaware Supreme Court correctly identified the *Strickland* standard as governing Petitioner's instant ineffective assistance of counsel contentions.  As a result, the Delaware Supreme Court's decision was not contrary to clearly established federal law.

The Court must also determine if the Delaware Supreme Court reasonably applied the *Strickland* standard to the facts of Petitioner's case.  *See Harrington*, 562 U.S. at 105-06.  When performing this inquiry, the Court must review the Delaware Supreme Court's denial of Petitioner's ineffective assistance of counsel allegation through a "doubly deferential" lens.  *Id.*  "[T]he question is not whether counsel's actions were reasonable, [but rather], whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*  When assessing prejudice under *Strickland*, the question is "whether it is reasonably likely the result would have been different" but for counsel's performance, and the "likelihood of a different result must be substantial, not just conceivable." *Id.*  And finally, when viewing a state court's determination that a *Strickland* claim lacks merit through the lens of § 2254(d), federal habeas relief is precluded "so long as fairminded jurists could disagree on the correctness of the state court's decision." *Id.* at 101.

### 1. Claim One

Petitioner contends that defense counsel provided ineffective assistance by failing to move to suppress the out-of-court statements of two State witnesses: Isaiah Fields and William Coleman.  (D.I. 1 at 5; D.I. 29 at 15, 28)  Both Fields and Coleman provided statements to Detective Ciritella concerning Petitioner's role in the shooting of Francis and Guy, and they also testified during Petitioner's trial.  *See Washington*, 2016 WL 5407852, at *1, *5.  For the following reasons, the Court concludes that the Delaware Supreme Court reasonably applied *Strickland* in denying this argument.

During Petitioner's trial, Isaiah Fields testified that, while in the same prison as Petitioner, Petitioner told Fields that he unintentionally killed Francis and Guy with a MAC-10 in a robbery or drug deal that went wrong.  (D.I. 47-3 at 85-88)  Fields also testified that he saw Petitioner accidentally fire a MAC-10 at 930 Spruce Street a few months before Francis and Guy were killed.  (*Id.*)  William Coleman testified at trial that, while he and Petitioner were in the same prison, Petitioner told Coleman that he shot Francis and Guy from the back seat of a car with a MAC-10 in a robbery that went wrong, that he disposed of the MAC-10 used in the shooting, and that April Gardner had witnessed the shooting.  (D.I. 47-3 at 63-67)  On cross-examination, defense counsel used letters that Coleman wrote to the police with this information to expose inconsistencies between his version of events in the letters and his trial testimony, as well as his strongly expressed desire for a deal in exchange for providing information about the shooting; the letters were admitted into evidence.  (D.I. 47-3 at 67-72)

20

In his first Rule 61 motion, Petitioner argued that defense counsel provided ineffective assistance by not moving to suppress the out-of-court statements Fields and Coleman provided to Detective Ciritella under Delaware Rule of Evidence 404 and 11 Del. C. § 3507.  (D.I. 47-28 at 2, 4; D.I. 76-3 at 7-9)  The Superior Court Commissioner recommended that Claim One should be denied because defense counsel "was not deficient for failing to object or move to suppress Fields' or Coleman's statements – there was no basis to do so." *Coleman*, 2016 WL 5407852, at *6.  As an initial matter, "neither Fields' nor Coleman's *statements* were introduced pursuant to 11 Del. C. § 3507.  The only testimony the State offered thr[ough] Fields and Coleman was live, in-court *testimony*." *Washington*, 2016 WL 5407852, at *5 (emphasis added).  The Superior Court Commissioner explained that defense counsel had "no meritorious basis upon which to object to [particular statements made at trial that were part] of Fields' or Waterman's *testimony*." *Id.* (emphasis added).  The Superior Court adopted the Commissioner's Report, and denied Claim One.  *See Washington*, 2016 WL 6248462, at *3.

The Delaware Supreme Court affirmed the Superior Court's decision that defense counsel did not perform deficiently, and also held that Petitioner failed to satisfy the prejudice prong of *Strickland*. *See Washington*, 2017 WL 1573119, at *3.  With respect to Petitioner's failure to satisfy *Strickland*'s performance prong, the Delaware Supreme determined that defense counsel did not have a basis to object or move to suppress Fields' or Coleman's testimony under the Delaware Rules of Evidence or § 3507, because: (1) Fields' testimony about seeing Petitioner with a MAC-10, a

21

candidate weapon in the shooting of Francis and Guy, was highly relevant and not unduly prejudicial D.R.E. 403; (2) defense counsel had no basis to object to the prior accidental shooting evidence under D.R.E. 404(b); (3) Fields' testimony was offered for a proper purpose—to show that Petitioner had possessed the same type of weapon used in the shooting, rather than his general criminal disposition; (4) Petitioner never identified any prior bad acts in the letters Coleman wrote to the police, which were admitted at trial; and (5) the State did not introduce Fields' and Coleman's out-of-court statements to the police at trial pursuant to § 3507. *See Washington,* 2017 WL 1573119, at *3.

On habeas review, the Court must defer to the Delaware Supreme Court's interpretation and application of Delaware's evidentiary rules. *See Scott v. Johnson,* 2014 WL 4955704, at *6 (D. Del. Sept. 30, 2014). Given the Delaware Supreme Court's determination that there was no meritorious basis upon which to object or move to suppress the testimony, the Court concludes that the Delaware Supreme Court reasonably applied *Strickland* when holding that defense counsel did not perform deficiently by failing to file a meritless motion.

In addition, Petitioner cannot demonstrate a reasonable probability that the outcome of his proceeding would have been different but for defense counsel's failure to either object to, or move to suppress, Fields' and Coleman's testimony. As determined by the Delaware Supreme Court, "[t]here was significant additional evidence presented at trial about [Petitioner's] role in the shooting, including Gardner's eyewitness testimony and Fields, Coleman, and Christopher Waterman's trial testimony that [Petitioner]

admitted to killing Francis and Guy." *Washington*, 2017 WL 1573119, at *3.  Given this record, the Court concludes that the Delaware Supreme Court reasonably applied *Strickland* in holding that Petitioner did not satisfy the prejudice-prong of *Strickland*. Accordingly, the Court will deny Claim One.

### 2.  Claims Five (b) and Ten (a)

In Claims Five (b) and Ten (a), Petitioner contends that defense counsel provided ineffective assistance by not objecting to the State's alleged misstatement of the evidence during closing arguments at trial that: (1) April Gardner testified Petitioner got into the back passenger side seat of the car moments before the car windows erupted; and (2) the State's ballistic expert, Rone, testified that, if more than one person had been present in the back of the car, that person would have been shot.  The Superior Court denied these Claims after reviewing the trial record and finding that the State's assertions were reasonable extrapolations from the evidence, including Gardner's eyewitness testimony that she saw Petitioner enter the back seat of the car immediately prior to the shooting and the ballistic trajectory of evidence showing that "anyone seated on that side would have been struck by the bullets." *Washington*,  2016 WL 5407852, at *7.

The Delaware Supreme Court affirmed the Superior Court's denial of Claims Five (b) and Ten (a), explaining:

> Gardner testified that she saw a car, with a man sitting in the driver's seat, parked in front of her house. Gardner saw Washington, who she knew, and an unknown man approach the car.  The unknown man entered the passenger side of the car while Washington sat on the steps of the house next door to Gardner's house. The unknown man then got out the car

and spoke to Washington.  Gardner testified that Washington then got in the back seat of the car and the unknown man got in the passenger side. A prosecutor may make logical implications based upon the evidence presented at trial.  The Superior Court did not err in accepting the Commissioner's conclusion that it was reasonably inferable from Gardner's testimony and view of the car that Washington got into the back passenger side of the car.

As to Rone's testimony, he testified that the shooter was seated in the back passenger side seat, but did not testify that if anyone other than the shooter had been in the back seat of the car, that person would have been shot. The evidence presented at trial did reflect that the interior of the car was riddled with bullet holes.  Even assuming it was not inferable from Rone's testimony that another person in the back seat would have been shot,[3] Washington has not pled an ineffective assistance of counsel claim or a colorable claim of a miscarriage of justice.  The possible existence of another person in the back seat with the shooter was irrelevant to the defense presented at trial.

At trial, [Petitioner] testified that he was at 930 Spruce Street, not the car, at the time of the shooting.  He also testified he gave a gun that had accidentally discharged at 930 Spruce Street to Gardner's then-boyfriend, who was interested in buying it, the evening of the shooting.   During cross-examination and closing arguments, [Petitioner's] counsel suggested Gardner's then-boyfriend shot Francis and Guy. The possibility of another person with the shooter in the back seat of the car has no relevance to [Petitioner's] defense that he was not present during the shooting.

---

[3]The State made the following comment about Rone's testimony during closing:

> Now, you heard from Carl Rone … and he told you that, in his expert opinion, that all the shots were fired from within the car, and he also -- and he also told you that they all came from the rear passenger seat, and that if someone else had gotten into the car and was seated in the passenger -- on the driver's side passenger seat, that they would have been shot.

(D.I. 79-4 at 100)

24

*Washington*, 2017 WL 1573119, at *5.

In order for a prosecutor's comments to amount to prosecutorial misconduct, the comments must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 180 (1986). When determining whether a prosecutor's comments are improper, the comments must be viewed in the context in which they were made. *See United States v. Young*, 470 U.S. 1, 11 (1985). Moreover, it is well-settled that, during closing summation, a prosecutor may properly comment on the evidence and all legitimate inferences which logically flow therefrom. *See Hughes v. State*, 437 A.2d 559, 573 (Del.1981). For instance, a "prosecutor is permitted—indeed expected—to comment on the evidence that was presented at trial and connect the dots for the jury by explaining what each piece of evidence means and how it all fits together to prove his or her case." *United States v. Hoffecker*, 530 F.3d 137, 194 (3d Cir.2008), *superseded on other grounds by regulation as stated in Rad v. Att'y Ge*n., 983 F.3d 651,668 n.13 (3d Cir. 2020).

The record reveals that the State's remarks concerning Gardner's testimony were supported by the evidence. As a result, defense counsel had no reason to object to State's comments that were based on reasonable inferences from the evidence. Therefore, the Delaware Supreme Court reasonably applied *Strickland* when denying Petitioner's ineffective assistance allegation concerning Gardner's testimony.

Although the Delaware Supreme Court implicitly acknowledged that the State's comment about Rone's testimony constituted a reasonable extrapolation from the evidence given the number of the bullet holes in the car's interior, the Delaware

25

Supreme Court alternatively held that defense counsel's failure to object did not amount to ineffective assistance because the presence of another person in the back seat was irrelevant to defense theory that Petitioner was not in the car at the time of the shooting.[4]  Because the Delaware Supreme Court's alternate holding provides a sufficient basis for the Court to conduct its § 2254(d) inquiry, the Court will not address whether the State's comment constituted a reasonable extrapolation from the evidence.

The record clearly demonstrates that Petitioner's theory of defense was that he was not in the car when the shooting occurred.  (*See* D.I. 79-4 at 117)  Given the defense theory that Petitioner was not involved at all in the shooting, the Delaware Supreme Court reasonably applied *Strickland* by holding that Petitioner failed to demonstrate a reasonable probability that objecting to the State's comments about Rone's testimony would have changed the outcome of his case.

Accordingly, the Court will deny Claims Five (b) and Ten (a) for failing to satisfy § 2254(d).

### 3.  Claims Seven (b) and Eleven

"During trial, the jury was escorted down to the courthouse sally port for a view of the actual vehicle where the victims were found dead.  During the jury view Washington was seated nearby in a DOC van.  After the jury view, Washington complained to the Judge that he could not see the vehicle from the DOC van where he had been seated.

---

[4]After explaining that Rone "did not testify that if anyone other than the shooter had been in the back seat of the car, that person would have been shot," the Delaware Supreme Court concluded that, "[e]ven assuming it was not inferable from Rone's testimony that another person in the back seat would have been shot, [Petitioner] has not pled an ineffective assistance of counsel claim." *Washington*, 2017 WL 1573119, at *5.

The Judge then instructed the State to have the car brought back over to the courthouse so Washington could view it; which he did." 2016 WL 5407852, at *8.

In Claims Seven (b) and Eleven, Petitioner asserts that defense counsel was ineffective for not asking Rone additional questions about his findings after Petitioner viewed the car during trial. In his first Rule 61 motion, Petitioner stated that

> he wanted the following questions asked: (1) "[t]he vehicle was clean[ed] out and the driver and passenger seat[s] was move[ed] up and down and back and forth prior to insertion of the trajectory rods[,] will that effect the opinion on where the shooting may have took place," and (2) "[c]onsidering all the impact rounds discovered within the vehicle what is the opinion on the possible people that could have been seated inside during the shooting."

2016 WL 5407852, at *9 (alterations in the original).

The Superior Court Commissioner recommended that Petitioner's argument be denied under both prongs of *Strickland*, stating:

> [Petitioner's] claim fails because he has not shown that Trial Counsel's performance was deficient in any way. Nor has [Petitioner] shown that the outcome of the trial would have been different had these specific questions been asked—by anyone. Trial Counsel is vested with wide latitude in conducting cross examination and deciding what questions to ask, or not ask. My review of the trial transcripts reveals that Rone was subjected to a lengthy and vigorous cross examination. [Petitioner's] first question is based on the premise that the seats in the car were moved prior to insertion of the trajectory rods, an assertion I can find no support for anywhere in the record. [Petitioner's] second question was actually answered by Rone. Rone testified that the shooter was seated in the rear passenger side seat based on the trajectory of the bullets.

*Washington*, 2016 WL 5407852, at *9. The Superior Court subsequently adopted the Commissioner's Report. *See Washington*, 2016 WL 6248462, at *2-3. On post-

conviction appeal, the Delaware Supreme Court applied *Strickland* and found that trial counsel did not perform deficiently and that Petitioner did not show a reasonable probability of a different outcome if counsel had asked the questions Petitioner now raises, noting:

> After [Petitioner] viewed the car [during the trial] and the Superior Court asked him if there was anything else he needed with respect to the car and his case, he responded in the negative. [Petitioner's] counsel had already subjected Rone to extensive cross examination and did not have any further questions. [D.I. 47-3 at 175-76].

*Washington*, 2017 WL 1573119, at *6.

An attorney's decision regarding the cross-examination of witnesses is strategic in nature and will not constitute the basis for ineffective assistance if the decision was reasonably made. *See Revel v. Pierce*, 66 F. Supp. 3d 517, 527 (D. Del. 2014). Here, the record reflects that defense counsel extensively and vigorously cross-examined Rone and did not have any further questions. *See Washington*, 2017 WL 1573119, at *6. The Delaware Supreme Court did not unreasonably apply *Strickland*, when, as summarized above, it found no deficient performance or prejudice to Petitioner. *See Strickland*, 466 U.S. at 688; *Glass v. Sec'y Pennsylvania Dep't of Corr.*, 726 F. App'x 930, 933 (3d Cir. 2018) ("[T]rial counsel cannot be deemed ineffective for failing to pursue meritless arguments."); *see also Lockhart v. Fretwell*, 506 U.S. 364, 382 (1993).

The Delaware Supreme Court also reasonably found that Petitioner could not establish any prejudice under *Strickland*. The evidence against Petitioner was

overwhelming,[5] and Petitioner failed to show a reasonable probability that the outcome of his trial would have been different if the two questions had been asked.

Based on the foregoing, the Court concludes the Delaware Supreme Court reasonably applied the *Strickland* standard to Claims Seven (b) and Eleven. Accordingly, the Court will deny these Claims.

## B. Procedurally Barred Ineffective Assistance of Counsel Claims

The record reveals that Petitioner did not include the following ineffective assistance of counsel Claims in his Rule 61 motion or present them to the Delaware Supreme Court on post-conviction appeal: Claims Eight, Nine, Ten (b), (c), Twelve (b), (c), Thirteen, Fourteen (a), Sixteen, Seventeen, Eighteen, Nineteen, Twenty, Twenty-One (b), and Twenty-Two (a). Because Petitioner failed to fairly present these twelve Claims to the Delaware state courts and any attempt to raise them now would be time-barred or barred as successive,[6] the Claims are procedurally defaulted.

Additionally, although Petitioner presented Claim Twelve (a) to the Delaware Supreme Court on post-conviction appeal, the Delaware Supreme Court reviewed the

---

[5]*See supra* at Section III.A.1; *see infra* at Sections III.B.2, III.B.4, and n.11.
[6]Any attempt by Petitioner to raise these Claims in a new Rule 61 motion would be barred as untimely under Delaware Superior Court Criminal Rule 61(i)(1) and as successive under Rule 61(i)(2). *See Parker v. DeMatteis*, 2021 WL 3709733, at *6 (D. Del. Aug. 20, 2021). Although Rule 61 provides for an exception to its procedural bars if a Rule 61 motion "asserts a retroactively applicable right that is newly recognized after the judgment of conviction is final," no such right is implicated in the instant Claims. Similarly, the exceptions to Rule 61 bars contained in Rule 61(i)(5) and (d)(2) do not apply to Petitioner's case, because he does not allege actual innocence, lack of jurisdiction, or that a new rule of constitutional law applies to Claims Eight, Nine, Ten (b), Twelve (b) and (c), Thirteen, Fourteen, Sixteen, Seventeen, Eighteen, Nineteen, Twenty, Twenty-One (b) and Twenty-Two (a).

Claim for plain error under Delaware Supreme Court Rule 8 because Petitioner did not present it to the Superior Court in his Rule 61 motion.  By explicitly applying the plain error doctrine to Claim Twelve (a), the Delaware Supreme Court articulated a "plain statement" under *Harris v. Reed* that its decision rested on state law grounds.  *See Harris*, 489 U.S. at 263-64.  In turn, Delaware's plain error doctrine constitutes an independent and adequate state procedural rule for procedural default purposes.  *See Campbell v. Burris*, 515 F.3d 172, 177–82 (3d Cir. 2008).  Thus, Claim Twelve (a) is procedurally defaulted.

Since Claims Eight, Nine, Ten (b) and (c), Twelve (a), (b), and (c), Thirteen, Fourteen (a), Sixteen, Seventeen, Eighteen, Nineteen, Twenty, Twenty-One (b), and Twenty-Two (a) are procedurally defaulted, the Court cannot review the merits of the Claims absent a showing of cause and prejudice, or a miscarriage of justice.  Petitioner attempts to establish cause for his default under *Martinez v. Ryan*, 566 U.S. 1 (2012), by arguing that his post-conviction counsel provided ineffective assistance by not raising these Claims in his initial Rule 61 proceeding.[7]   In *Martinez*, the Supreme Court held that inadequate assistance of counsel during an initial-review state collateral proceeding may (under certain circumstances) establish cause for a petitioner's procedural default of a claim of ineffective assistance of trial counsel.  *See Martinez*, 566 U.S. at 12, 16-17.  Specifically, a petitioner must demonstrate that the post-conviction attorney in his first

_____

[7]Petitioner asserts that post-conviction counsel provided ineffective assistance by moving to withdraw from his Rule 61 proceeding and not raising these Claims, and also by failing to inform him that he should raise the prosecutorial misconduct claims as ineffective assistance of counsel claims to avoid Rule 61's procedural bars.  (D.I. 1 at 18-23, 26-31; D.I. 29 at 6-7; D.I. 34 at 2-3; D.I. 69 at 16, 20-23; D.I. 72)

collateral proceeding was ineffective under the *Strickland* standard (or that petitioner

was not provided with representation), the underlying ineffective assistance of counsel

claim is substantial (*i.e.*, has "some merit"), and the petitioner was prejudiced.  *See*

*Martinez*, 566 U.S. at 14-17.  The Third Circuit has explained the application of *Martinez*

in habeas cases:

> *Martinez* recognizes a narrow exception to the doctrine of
> procedural default: Inadequate assistance of counsel at initial-
> review collateral proceedings may establish cause for a
> prisoner's procedural default of a claim of ineffective
> assistance at trial. This exception is available to a petitioner
> who can show that: 1) his procedurally defaulted ineffective
> assistance of trial counsel claim has "some merit," and that 2)
> his state-post conviction counsel was ineffective under the
> standards of *Strickland v. Washington*.

*Workman v. Sup't Albion SCI*, 915 F.3d 928, 937 (3d Cir. 2019).  In other words,

pursuant to *Workman*, a petitioner need only show that the underlying ineffective

assistance of counsel claim is substantial (*i.e.*, has "some merit") to demonstrate the

prejudice prong of *Strickland. See id*. at 938-39.  "To demonstrate that his claim has

some merit, a petitioner must 'show that reasonable jurists could debate whether (or, for

that matter, agree that) the petition should have been resolved in a different manner or

that the issues presented were adequate to deserve encouragement to proceed

further.'"  *Id*. at 938 (*quoting Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003)). To

demonstrate that post-conviction counsel's ineffectiveness caused the procedural

default, a petitioner must show that post-conviction counsel's performance was deficient

under the first prong of the *Strickland* standard, *i.e.*, "that his state post-conviction

counsel's performance fell below an objective standard of reasonableness."  *Workman*,

915 F.3d at 941.  Notably, the *Martinez*-exception for procedural default is limited to underlying ineffective assistance of trial counsel claims, and does not apply to underlying ineffective assistance of appellate counsel claims.  *See Davila v. Davis*, 137 S.Ct. 2058, 2068 (2017) (noting that the equitable concerns of *Martinez* do not apply to claims of ineffective assistance of appellate counsel because state had made a deliberate choice to move ineffective assistance of trial counsel claims outside of the direct appeal process where counsel is not constitutionally guaranteed, but ineffective assistance of appellate counsel claims could never have been raised during the direct appeal process).

   1. ***Martinez*, cause, and post-conviction counsel's actions with respect to Claims Twelve (b), Thirteen, Seventeen, Eighteen, and Twenty**

   Petitioner has failed to demonstrate that post-conviction counsel's actions excuse his default of Claims Twelve (b), Thirteen, Seventeen, Eighteen, and Twenty under the limited exception recognized in *Martinez*.  After post-conviction counsel moved to withdraw from representing Petitioner during his first Rule 61 proceeding, Petitioner raised the ineffective assistance of trial counsel arguments set forth in Claims Twelve (b), Thirteen, Seventeen, Eighteen, and Twenty in the Rule 61 motion, but he subsequently voluntarily withdrew the Claims from the Superior Court's consideration. (*See* D.I.47-26 at 2); *see also Washington*, 2016 WL 5407852, at *4 (noting that Petitioner requested that court ignore certain issues raised in the original Rule 61 motion).  Because Petitioner expressly withdrew Claims Twelve (b), Thirteen, Seventeen, Eighteen, and Twenty from the Superior Court's consideration, post-

conviction counsel's failure to raise these Claims cannot constitute cause for Petitioner's default. *See Kellum v. Pierce*, 24 F. Supp. 3d 390, 405 (D. Del. 2014).

Additionally, the Court notes that Claim Fifteen—which independently and separately alleges that post-conviction counsel was ineffective for not helping to prove Petitioner's actual innocence and for moving to withdraw from representing Petitioner during his first Rule 61 proceeding—cannot provide cause for Petitioner's default of Claims Twelve (b), Thirteen, Seventeen, Eighteen, and Twenty.  An allegation of ineffective assistance of post-conviction counsel can only establish cause for a default when the underlying claim alleges the ineffective assistance of trial counsel.  *See Davila*, 137 S.Ct. at 2062.

In sum, *Martinez* does not excuse Petitioner's default of Claims Twelve (b), Thirteen, Seventeen, Eighteen, and Twenty.

### 2. *Martinez*, cause, and the "substantiality" of Claims Eight, Nine, Ten (b) & (c), Twelve (a) & (c), Fourteen (a), Sixteen, Nineteen, Twenty-One (b), and Twenty-Two (a)

Petitioner also cannot establish cause under *Martinez* for his default of Claims Eight, Nine, Ten (b) and (c), Twelve (a) and (c), Fourteen (a), Sixteen, Nineteen, Twenty-One (b), and Twenty-Two (a) because, for the reasons set forth below, he has failed to demonstrate that the underlying ineffective assistance of trial counsel arguments are substantial.

### a.   Claim Eight

Petitioner's argument that defense counsel provided ineffective assistance by not having the evidence that was collected from the victims' vehicle tested for DNA is "not

substantial" for the purposes of the *Martinez* exception.  "Trial management is the lawyer's province: Counsel provides his or her assistance by making decisions such as what arguments to pursue, what evidentiary objections to raise, and what agreements to conclude regarding the admission of evidence."  *McCoy v. Louisiana*,  138 S.Ct. 1500, 1508 (2018).  Witness selection is one of the "non-fundamental decisions that counsel is entitled to make at trial."  *Gov't of the Virgin Islands v. Weatherwax*, 77 F.3d 1425, 1434 (3d Cir. 1996).  Notably, effective assistance does not demand that every possible motion be filed, but only those having a solid foundation."  *United States v. Swinehart*, 617 F.2d 336, 341 (3d Cir. 1980).   In his responsive Rule 61 affidavit to Petitioner's initial *pro se* Rule 61 motion filed on March 7, 2012,[8] defense counsel explained that

> [a]n independent defense DNA expert would not have been able to reasonably be of value to the defense of the case in light of other evidence and testimony presented by the State. The State's pathologist indicated that DNA profiles matching the decedents, [Petitioner], and unknown third parties were recovered from the vehicle.  Because of the inherent nature of a vehicle used for personal purposes, it is not surprising that additional DNA was recovered from the vehicle.  Counsel made the informed decision that presentation of an independent DNA expert would merely cumulate the DNA testimony presented by the State and confuse the issues for the jury.

(D.I. 47-20 at 25-26)

---

[8]Petitioner raised Claim Eight in his Memorandum supporting the initial *pro se* Rule 61 motion he filed on March 7, 2012.  (D.I. 47-19 at 10)  Defense counsel filed an affidavit responding to the allegations in Petitioner's March 7, 2012 Rule 61 motion, and specifically responded to Claim Eight.  (D.I. 47-20 at 25-26)  Petitioner did not include Claim Eight in the amended Rule 61 motion he filed after post-conviction counsel filed a motion to withdraw.  *See Washington*, 2016 WL 5407852, at *4.  Thus, the Court also concludes that *Martinez* does not apply to excuse Petitioner's default of Claim Eight because he knowingly and intentionally failed to include the Claim for the Superior Court's consideration.  *See supra* at Section III.B.1.

Moreover, Petitioner fails to demonstrate how the absence of DNA testing of the items collected from the victims' vehicle resulted in prejudice. The jury was advised that the parties stipulated that "items were tested for possible DNA analysis" and "[n]one of the items tested produced a conclusive match to any particular individual." (D.I. 47-3 at 33, 173) The lack of DNA and fingerprint evidence tying Petitioner to the car supported his defense that he was not in the car at the time of the shooting. *See Washington*, 2017 WL 1573119, at *5; (D.I. 47-3 at 173, 296, 304) For these reasons, the Court concludes that *Martinez* cannot be used to excuse Petitioner's default of Claim Eight because the underlying ineffective assistance counsel argument contained therein is not substantial.

### b. Claim Nine

During summation, the State highlighted the "fact that that Waterman was not given any type of specific promise or deal for his testimony," but also acknowledged that Waterman "could avoid a substantial amount of jail time by cooperating and that he was required to testify truthfully." *Washington*, 2016 WL 5407852, at *6. In Claim Nine, Petitioner contends that defense counsel provided ineffective assistance by failing to object to the alleged misrepresentation by the State concerning Waterman's federal plea agreement.

The record supports the State's assertion that Waterman's plea agreement did not contain any promise or deal for his testimony. (D.I. 47-25 at 2-3) Additionally, during cross-examination, defense counsel thoroughly explored Waterman's plea agreement, cooperation, possible sentence, and motivation for testifying. (D.I. 47-3 at

50-56)  And finally, when addressing Petitioner's corresponding Rule 61 claim that the State engaged in prosecutorial misconduct by misrepresenting or mischaracterizing the evidence regarding the plea agreement (Claim Two in this proceeding), the Superior Court Commissioner held that Petitioner did not demonstrate prejudice to overcome the default of his prosecutorial default, finding that "[n]othing the prosecutor said during her summation was in any way a manipulation or mischaracterization of the evidence regarding the plea agreement." *Washington*, 2016 WL 5407852, at *6.  Given these circumstances, Claim Nine's assertion of ineffective assistance is not substantial and cannot provide cause for Petitioner's default.

### c.  Claims Ten (b), (c) and Twelve (a)

In Claims Ten (b), (c) and Twelve (a), Petitioner asserts that defense counsel was ineffective for failing to: (a) object to the prosecutor's "vouching" and "personal opinion [during closing] on how many people [were] seated inside the backseat [of the] vehicle during the shooting," and (b) perform an "adversarial test of the evidence that could have prove[n] [Petitioner's] innocence" and discredited Fields' testimony regarding [Petitioner's] "alleged prior bad act" of shooting a weapon. (D.I. 1 at 22, 26; D.I. 29 at 13, 20, 31)

With respect to defense counsel's failure to object to the State's alleged vouching, the evidence presented at trial showed that the two victims sat in the front of the vehicle while the shooter sat in the back passenger side seat.  *See Washington*, 2017 WL 1573119, at *5; *see also* (D.I. 47-3 at 155).  The evidence also showed that the car's interior was riddled with bullet holes. *See Washington*, 2017 WL 1573119, at

*5; *see also* (D.I. 47-3 at 153-55)  During closing, the State asserted that Rone, the State's ballistics expert, testified that there could not have been any other individual in the back seat of the vehicle when the murder occurred.  (D.I. 79-4 at 100)  Despite his instant complaint regarding defense counsel's representation, Petitioner has failed to demonstrate that defense counsel had a factual basis for objecting to this statement. During the course of the expert's testimony, the State presented over 22 photographs of bullet holes in the vehicle and asked the ballistics expert to describe to the jury what each photograph depicted and to explain the path of the bullets. (D.I. 47-3 at 153-155) Additionally, the jury was permitted to view the vehicle in which the victims were shot and observe the bullet holes of that vehicle.  (D.I. 47-3 at 166)  Rone based his opinion—which was presented to the jury—on the aforementioned evidence.  The testimony provided during the trial demonstrates that the statement made during the State's closing was a legitimate argument based on the evidence.  Moreover, Petitioner's defense at trial was that he was not present at the shooting.  Therefore, the possible existence of another person in the back seat with the shooter was irrelevant to his defense.  *See Washington*, 2017 WL 1573119, at *5.

Based on the foregoing, the Court concludes that Petitioner's instant contention concerning defense counsel's failure to object to the State's comment during closing about the number of individuals in the back seat lacks is not "substantial" under *Martinez*.

Petitioner's complaint about defense counsel's failure to perform an adversarial test of the evidence that could have proved his innocence and could have discredited

Fields' testimony regarding Petitioner's alleged prior bad act of shooting a weapon also fails to assert a substantial ineffective assistance of counsel claim. Petitioner argues that defense counsel should have performed trajectory testing to reconstruct the path of the projectiles at 930 Spruce Street. The trajectory of the shots was not at issue. In addition, Detective Ciritella testified that he found patched-up bullet holes in 930 Spruce Street's living room wall, as Fields indicated he would, and another officer testified that two of the bullets, which were given to Rone to test, were found in that wall. (D.I. 47-3 at 95-97, 128) While cross-examining Fields, defense counsel effectively exposed inconsistencies between Fields' prior version of events and his trial testimony regarding the accidental shooting at 930 Spruce Street. (D.I. 47-3 at 89-91) Moreover, as the Superior Court Commissioner recognized, the fact that Petitioner had possessed a firearm or that it accidentally "went off" was not, by itself, a "bad act." *Washington*, 2016 WL 5407852, at *5.

Further, defense counsel was not ineffective because Petitioner's own testimony tied the gun used at 930 Spruce Street to the gun used in the homicides. Specifically, Petitioner testified at trial that while present at 930 Spruce Street, he observed Fields with this firearm "looking at it, . . . playing with it back and forth and the gun just went off in the floor into the wall." (D.I. 76-5 at 90) Petitioner also testified, "next time I seen that gun was the day of the shooting accident." (D.I. 47-3 at 196) Petitioner testified that on that date—September 1st—he gave the gun to Kareem Bay who was interested in buying it. (D.I. 47-3 at 196-97)

Finally, the significant additional evidence presented at trial of Petitioner's

38

guilt forecloses Petitioner's ability to demonstrate a reasonable probability that the outcome of his trial would have been different but for defense counsel's failure to object and perform trajectory testing.  Gardner provided eyewitness testimony that she saw Petitioner get into the back seat of the car and watched the windows explode immediately thereafter.  Fields, Coleman, and Waterman testified that Petitioner admitted to killing Francis and Guy.  (D.I. 47-3 at 48-50, 63-67, 73-76, 85-88)  For all of these reasons, the Court concludes that Claims Ten (b), (c) and Twelve (a) are not substantial and, therefore, do not excuse Petitioner's default.

### d.  Claim Twelve (c)

In Claim Twelve (c), Petitioner asserts that defense counsel was ineffective for not objecting to Detective Ciritella testifying as an expert about the bullets and bullet holes he found at 930 Spruce Street without performing a "scientific trajectory test" to determine where the shooting took place.  (D.I. 1 at 26; D.I 29 at 18, 20 22)  Petitioner also argues that Detective Ciritella's testimony improperly vouched for Fields' credibility regarding where the gun was shot.

Contrary to Petitioner's assertion, Detective Ciritella did not testify as a ballistics expert.  Rather, Detective Ciritella testified about the evidence he found while executing a search warrant at 930 Spruce Street.  (D.I. 47-3 at 95-97)  Fields stated that he was with Petitioner a few months before the homicides and had observed Petitioner with a Mac-10 handgun, which was the candidate murder weapon.  (D.I. 47-3 at 86-87)  Fields told Detective Ciritella that, while Petitioner was "playing with [the gun], it went off," and that the police might find bullet holes in a wall at 930 Spruce Street, which would be

easily identified by patches. (*Id.*)  Based upon this information, Detective Ciritella obtained a search warrant and located patched-up bullet holes in a wall in the house, and also in the house's floor and basement wall.  (D.I. 47-3 at 95-97)  The State's ballistic expert, Rone, testified that three bullets collected by Detective Ciritella at the house were fired from the same firearm as the murder weapon.  (D.I. 47-3 at 151) Because Detective Ciritella did not provide expert testimony, defense counsel cannot be faulted by not objecting on that basis.

Further, as discussed above, Petitioner fails to demonstrate that defense counsel was ineffective by not performing trajectory testing to reconstruct the projectiles' path at 930 Spruce Street, or that the absence of trajectory testing prejudiced him. Any inconsistencies between Fields' prior version of events and his trial testimony were exposed by defense counsel on cross-examination.  (D.I. 47-3 at 89-91)

Finally, given the significant other evidence presented at trial of Petitioner's guilt—Gardner's eyewitness testimony and the testimony provided by Fields, Waterman, and Coleman—Petitioner cannot show a reasonable probability of a different outcome.  (D.I. 47-3 at 48-50, 63-67, 73-76, 85-88)  Thus, Claim Twelve (c) is not substantial under *Martinez*.

### e.  Claim Fourteen (a)

In Claim Fourteen (a), Petitioner argues that defense counsel provided ineffective assistance by failing to investigate and disclose a conflict of interest prior to trial and by failing to disclose his terminal illness.  (D.I. 1 at 30; D.I. 29 at 32)  According to Petitioner, defense counsel was aware that he had a "deadly disease" and only had

months to live prior to his trial, and such information was "imperative" for Petitioner a

determination whether defense counsel was physically, mentally, and emotionally stable

to represent him and that medication could have impaired defense counsel's judgment.

(*Id.*)  Petitioner also contends that defense counsel was ineffective for failing to disclose

that he had a personal relationship with the prosecutor and that the prosecutor used to

work for him prior to being an attorney.  (*Id.*)

These arguments are insubstantial and do not establish cause under *Martinez*.

First, defense counsel died in 2012,[9] years after Petitioner's trial, and his death alone

does not support an ineffective assistance of counsel claim.  *See United States v.*

*Lampton,* 1995 WL 33676, at *3 (E.D. La. Jan. 27, 1995) ("The fact that defense

counsel died some period of months after sentencing does not in and of itself support a

claim for ineffective assistance of counsel."); *Hayes v. Bowersox*, 2016 WL 659081, at

*14 (E.D. Mo. Feb. 18, 2016) ("A lack of evidence as to counsel's health at trial cannot

give rise to a claim for ineffective assistance of counsel."); *United States v. Stutson*, 541

F. App'x 893 (10th Cir. 2013) (agreeing with district court's conclusion that petitioner

failed to show prejudice from trial counsel's failure to inform him that he suffered from

terminal brain cancer); *Yarrington v. U.S.*, 2013 WL 2155501, at *3 (C.D. Ill. May 17,

2013) (concluding that petitioner's ineffective assistance of counsel claim was without

merit where petitioner argued that counsel had a duty and obligation to advise him of his

terminal illness).  Second, conclusory allegations of a "conflict of interest" based upon

defense counsel's friendship with the prosecutor do not support a claim for ineffective

---

[9]*See* https://www.legacy.com/us/obituaries/delawareonline/name/peter-letang-
obituary?id=19008577

assistance of counsel.  *See Boughner v. Johnson*, 1996 WL 534867, at *2 (D. Del. Sept.

11, 1996); *State v. Wilkerson*, 2016 WL 795978, at *8, 13 (Del. Super. Ct. Feb. 26,

2016) (rejecting defendant's claim that defense counsel's alleged friendship with

prosecutor was conflict of interest).  Nothing in the record shows any incapacity or

impropriety of defense counsel.  Petitioner has not shown how defense counsel's

medical condition or personal relationship with the prosecutor caused defense counsel

to perform deficiently or that his condition or friendship with the prosecutor prejudiced

Petitioner.  *See Hayes*, 2016 WL 659081, at *14-15; *McDougall v. Rice*, 685 F. Supp.

532, 539-40 (W.D.N.C. 1988); *accord, Young v. Zant*, 727 F.2d 1489, 1492-93 (11th Cir.

1984) (Petitioner's observation that counsel ingested drugs during trial and counsel's

admission of his drug problem in another proceeding do not automatically support a

claim of ineffectiveness);  *Hernandez v. Wainwright*, 634 F. Supp. 241, 245 (S.D. Fla.

1986) (petitioner's claims that counsel was an alcoholic and had alcohol on his breath

during trial were not enough to constitute a *per se* Sixth Amendment violation; instead,

petitioner had to show how the condition caused counsel to render deficient legal

representation which resulted in prejudice). Therefore, Petitioner's instant ineffective

assistance of counsel allegations are insubstantial and cannot excuse his default of

Claim Fourteen.

### f.  Claim Sixteen

In Claim Sixteen, Petitioner contends that defense counsel failed to effectively

cross-examine State witness Coleman about Petitioner never personally admitting

to him that April Gardner had witnessed the shooting. (D.I. 29 at 17)  It is well-settled that an otherwise reasonable decision by counsel not to call certain witnesses is not ineffective simply because it differed from the defendant's wishes. *See, e.g., Diggs v. Owens*, 833 F.2d 439, 445–46 (3d Cir.1987).  Here, Petitioner fails to allege facts showing that trial counsel's actions were deficient.  The record shows that Coleman testified at trial that Petitioner personally told him that: (a) he shot the victims from the back seat of a car with a MAC-10 during a robbery; (b) he had disposed of the MAC-10 used in the shooting; and (c) April Gardner had witnessed the shooting.  (*See* D.I. 47-3 at 63-67)  Defense counsel conducted a thorough and vigorous cross-examination of Coleman and used the letters Coleman wrote to the police to expose inconsistencies between the version of events in his letters and his trial testimony, as well as eliciting Coleman's desire for a deal in exchange for providing information about the shooting. (*See* D.I. 47-3 at 67-73)

Petitioner also cannot demonstrate a reasonable probability that the outcome of his case would have been different but for defense counsel's failure to cross-examine Coleman in the manner Petitioner wished he had.  Once again, as previously discussed, there was overwhelming evidence presented at trial against Petitioner.  (D.I. 47-3 at 48-50, 63-67, 73-76, 85-88)

For these reasons, the Court concludes that the instant allegation of ineffective assistance is insubstantial and cannot provide cause for Petitioner's default.

### g. Claim Nineteen

In Claim Nineteen, Petitioner argues that defense counsel provided ineffective assistance by failing to seek a reduction in his sentence. Petitioner, however, proffers no valid legal basis upon which defense counsel should have moved to reduce his sentence. (*See* D.I. 29 at 36) Therefore, Petitioner has failed to demonstrate that Claim Nineteen is substantial for the purposes of fitting within *Martinez*'s limited exception to the procedural default doctrine.

### h. Claim Twenty-One (b)

In Claim Twenty-One (b), Petitioner contends that defense counsel was ineffective for failing to "protect and/or raise" on direct appeal the "new" evidence that the State committed a *Brady* violation by not disclosing at the time of Petitioner's trial that Fields was the beneficiary of a tacit sentence reduction agreement. (D.I. 69 at 13) The *Martinez* rule only provides a method for avoiding the procedural default of an ineffective assistance of *trial* counsel claim, not a claim alleging the ineffective assistance of *appellate* counsel. Therefore, Petitioner has not established cause for his default of Claim Twenty-One (b).

### i.   Claim Twenty-Two (a)

In Claim Twenty-Two (a), Petitioner contends that defense counsel was ineffective for failing to "adequately" cross-examine Rone as to his "certifications" or "findings about the bullets and casings." (D.I. 69 at 24, 27) Petitioner asserts that defense counsel conceded that Rone was an expert and stipulated to his qualifications

instead of cross-examining him as to his "lapsed credentials," which he contends would have prevented the jury from seeing or hearing about the physical evidence he tested. (D.I. 69 at 24-27)   Additionally, Petitioner alleges that Rone's methodology as to the physical evidence in this case was "erroneous," and "new evidence . . . proves Carl Rone's testing was insufficient, unreliable, and he shouldn't [have] been testifying as an expert witness." (D.I. 69 at 20, 27)   Petitioner also notes that Rone was charged and convicted for falsifying business records in 2016.  (D.I. 69 at 27)

The Superior Court rejected the same underlying argument when it denied Petitioner's second Rule 61 motion.  As the Delaware Superior Court recognized, Rone's testimony connecting the firearm used at 930 Spruce to the one used in the homicides was not crucial in determining guilt because Petitioner, whose own testimony established the connection, did not contest the ballistics match.  *See Washington*, 2021 WL 5232259, at *7-8.  Furthermore, the verdicts of manslaughter reveal that the jury rejected the only opinion of Rone's that Petitioner contested—that the murder weapon was a semi-automatic weapon requiring a separate trigger pull for each shot.  Separate trigger pulls would have indicated intentional first degree murders, while an automatic weapon, requiring only a single trigger pull, could manifest recklessness.  *Id.*  In addition, since Delaware courts previously found that Rone qualified as an expert in firearms and toolmark identification under D.R.E 702 in several earlier trials in Delaware, Petitioner cannot demonstrate a reasonable probability that a challenge to Rone's credentials in his case would have been productive.  *See Phillips*, 2015 WL 5168253, at *3-4.  To the extent Petitioner relies on Rone's subsequent convictions for

45

falsifying records, defense counsel could not have known about Rone's misconduct that he committed years after Petitioner's trial. *See Dooley v. Petsock*, 816 F.2d 885, 891 (3d Cir. 1987) ("clairvoyance is not required of effective trial counsel.").

Moreover, Petitioner cannot demonstrate a reasonable probability that he would not have been convicted but for defense counsel's failure to cross-examine Rone in the manner wished by Petitioner. Rone's testimony was not critical; this was not a close case and there was overwhelming evidence, independent of Rone's testimony, presented at trial against Petitioner. (D.I. 47-3 at 48-50, 63-67, 73-76, 85-88) Thus, Petitioner's instant allegation of defense counsel's ineffective assistance cannot provide cause for his default because the allegation is insubstantial.

### 3. Absence of cause and prejudice

For the reasons set forth above, the Court concludes that Petitioner has failed to demonstrate cause for his default of Claims Eight, Nine, Ten (b) and (c), Twelve (a), (b), and (c), Thirteen, Fourteen (a), Sixteen, Seventeen, Eighteen, Nineteen, Twenty, Twenty-One (b), and Twenty-Two (a). Given the absence of cause, the Court will not address the issue of prejudice.

### 4. Miscarriage of justice

Finally, Petitioner contends that his procedural default of the instant thirteen ineffective assistance of counsel Claims should be excused, and their merits reviewed, in order to prevent a miscarriage of justice. In support of this contention, Petitioner asserts that he is "actually innocent," as demonstrated by the following "new" evidence: (1) State witness Christopher Waterman recanted his testimony (2) State witness

46

Isaiah Fields was the beneficiary of an undisclosed tacit sentence reduction agreement, resulting in a *Brady* violation; (3) the State's expert ballistics witness, Carl Rone, used unreliable methods and misled the jury by misrepresenting his credentials; and (4) inmate Jeree Richardson submitted an exculpatory affidavit.  (*See* D.I. 29 at 6-7; D.I. 34 at 10; D.I. 46 at 11; D.I. 57 at 1; D.I. 69 at 9, 17, 20-21, 27; D.I. 70 at 2-3 of 3; D.I. 72 at 2)

In order to establish a miscarriage of justice, Petitioner must provide new reliable evidence of his actual innocence that was not presented at trial and that proves that no reasonable juror would have voted to find him guilty beyond a reasonable doubt.  *See Schlup v. Delo*, 513 U.S. 298,  327 (1995); *House v. Bell*, 547 U.S. 518, 536-37 (2006). For the reasons set forth below, Petitioner cannot satisfy this threshold showing of actual innocence.

### a.    Waterman's "recantation"

Petitioner asserts that there is a "reasonable probability that he is innocent," because Waterman has recanted his testimony.  (D.I. 34 at 8)  In support of this argument, Petitioner offers an unsworn July 2017 affidavit from Waterman asserting that "everything that [he] testified to against [Petitioner] at his trial was a total complete lie;" (2) Petitioner "never admitted to shooting or killing anyone personally to [him];" (3) he "honestly provided the prosecution and law enforcement with rumors and information that [he] heard from other inmates about [Petitioner] . . . and [he] made [his] statements appear as if [his] information directly came from [Petitioner] admitting to a double homicide and the things [he] testified to at his trial;" and (4) he lied at [Petitioner's] trial

in order to get a reduction in his sentence for federal weapon charges in exchange for his cooperation. (*See* D.I. 34 at 16-18)

In his second Rule 61 motion, Petitioner argued that Waterman's recantation created a strong inference that he is "actually innocent." (D.I. 76-9 at 20-21). The Superior Court rejected Petitioner's contention, explaining:

> Delaware courts generally view applications based on a witness' recantation with suspicion. The Delaware Supreme Court has held also that if recantations were "products of prison atmosphere [they are] to be received with great caution."
>
> Here, [Petitioner] asserts that Waterman's recantation of his testimony would "likely" change the outcome of the judgment. Waterman signed an affidavit stating his testimony was false and that [Petitioner] never admitted committing the killings to him. Further, Waterman states that he made up this testimony to get a sentence reduction for his prison term. Waterman claims his false testimony was based on rumors and the conversations of other inmates.
>
> Waterman's recantation would not "probably change the result if a new trial is granted[.]" Waterman testified during trial that [Petitioner] admitted guilt to him personally, but in Waterman's affidavit he states that he heard from other inmates that Washington committed the crime. Waterman's recantation must be viewed with suspicion. But even if the Court were to accept it at face value, it does not provide new evidence that a person other than [Petitioner] committed the crime, nor does it establish that no reasonable jury would have found [Petitioner] guilty beyond a reasonable doubt. Far from establishing that someone other than [Petitioner] committed the crimes, it shows that [Petitioner] was rumored to be the killer. If Waterman's affidavit is to be believed, it merely eliminates him as a witness, but does not challenge the factual accuracy of the rumors. Nor does it challenge the other independent, significant testimony from Fields and Coleman that [Petitioner] incriminated himself to them. Most importantly, it does not challenge Gardner's eyewitness testimony that she saw [Petitioner] enter the vehicle in which

> the Francis and Guy were killed moments before its windows "erupted" and that he later attempted to "apologize." The recantation merely impeaches Waterman's trial testimony and does not constitute new evidence that proves actual innocence.

*Washington*, 2021 WL 5232259, at *6.  The Delaware Supreme Court affirmed that decision.  *See Washington*, 2022 WL 1041267.

"Courts have historically viewed recantation testimony with great suspicion." *Landano v. Rafferty*, 856 F.2d 569, 572 (3d Cir. 1988); *see Dobbert v. Wainwright*, 468 U.S. 1231, 1233-34 (1984) ("Recantation testimony is properly viewed with great suspicion. It . . . is very often unreliable and given for suspect motives. . . .").  "As a general matter, a recantation in the absence of corroborating evidence or circumstances will probably fall short of the standard of reliability contemplated by *Schlup*."  *Howell v. Sup't Albion SCI*, 978 F.3d 54, 60 (3d Cir. 2020).  A court considering whether a claim of actual innocence premised on a recantation satisfies *Schlup* should analyze the recantation "on an individual and fact-specific basis."  *Howell*, 978 F.3d at 60.

After reviewing Waterman's affidavit in conjunction with the record and the foregoing legal framework, the Court concludes that Waterman's affidavit does not satisfy the *Schlup* standard for establishing actual innocence.  First, Waterman's proffered July 2017 affidavit is neither reliable nor credible.  Petitioner produced Waterman's affidavit more than six years after trial.  *See McQuiggin v. Perkins*, 569 U.S. 383, 399 (2013) ("As we stated in *Schlup*, [a] court may consider how the timing of the submission and the likely credibility of [a petitioner's] affiants bear on the probable reliability of ... evidence [of actual innocence].");  *Sistrunk v. Rozum*, 674 F.3d 181, 190-

91 (3d Cir. 2012) (rejecting equitable tolling argument based on a letter from a witness allegedly showing Sistrunk's actual innocence in part because the letter was produced a decade late).  Waterman's statements are even more implausible because the trial record reveals that there were attempts to intimidate Waterman in court on the day he testified against Petitioner (*see* D.I. 47-3 at 57-60), and because there was other significant, independent evidence against Petitioner that Waterman's posttrial statements do not address.

Second, Waterman's statements, to the extent they are a recantation, do not exonerate Petitioner or provide new evidence that a person other than Petitioner committed the crime.  Waterman testified at trial and was subject to cross-examination regarding whether his testimony at trial was based on statements Petitioner made directly to him or whether it was based on information he had heard from other inmates. (D.I. 47-3 at 48-57)  Defense counsel attacked Waterman's credibility and the trial record clearly shows that Waterman was questioned about motive, bias, and basis to lie. (D.I. 47-3 at 50-57)

Third, defense counsel introduced Waterman's plea agreement into evidence and cross-examined Waterman about his hopes that federal prosecutors would recommend a reduction in his sentence for federal weapon charges due to his cooperation with authorities in Petitioner's case.  (D.I. 47-3 at 50-57)  The plea agreement reflected that, if the government determined in its sole discretion Waterman had fulfilled his obligations of cooperation, the government would file a motion for a downward departure from the sentencing guidelines under U.S. Sentencing Guidelines

§ 5K1.1 and 18 U.S.C. § 3553(e).  *See Washington*, 2017 WL 1573119, at *4 (noting that neither § 5K1.1 nor § 3553(e) guaranteed Waterman sentencing leniency in exchange for his testimony).  Ultimately, the jury rejected Petitioner's argument that Waterman's testimony was not credible.  (*See* D.I. 47-3 at 50-57, 293, 299-300)

Furthermore, Waterman's post-trial recantation amounts to impeachment evidence and, unlike another person confessing guilt or exculpatory scientific evidence,[10] is insufficient to establish actual innocence.  As the United States Supreme Court has recognized, "latter-day evidence brought forward to impeach a prosecution witness will seldom, if ever, make a clear and convincing showing that no reasonable juror would have believed the heart of [the] account of petitioner's actions."  *Sawyer v. Whitley*, 505 U.S. 333, 349 (1992); *see Calderon v. Thompson*, 523 U.S. 538, 563 (1998) ("This impeachment evidence provides no basis for finding a miscarriage of justice.  As in *Sawyer*, the evidence is a step removed from evidence pertaining to the crime itself.  It tends only to impeach the credibility of [two witnesses].") (cleaned up).  That is especially true where, as here, the evidence is a "step removed" from the criminal acts themselves.  *Cf. Calderon*, 523 U.S. at 563.

Finally, even if the affidavit or unsworn statement constitutes new and reliable evidence—which the Court does not find—Petitioner has failed to establish that, without Waterman's testimony, no reasonable juror would have voted to find him guilty beyond a reasonable doubt. The question of Petitioner's guilt was not a close one. Aside from Waterman's testimony, there was significant additional evidence at trial of

---

[10]*See Schlup*, 513 U.S. at 324; *Sawyer*, 505 U.S. at 340-41.

Washington's guilt, including Gardner's eyewitness testimony (D.I. 47-3 at 73-76, 81),
and Fields' and Coleman's trial testimony that Washington admitted to killing Francis
and Guy (D.I. 47-3 at 63-67, 85-89).[11]   Although Petitioner has attacked the testimony of
Waterman and Fields, he is still left with the damning eyewitness testimony of April
Gardner.   At trial, Gardner testified that, prior to the shooting, she was outside sitting on
her front steps watching her grandson ride his bicycle when she observed Petitioner
and another male—later identified as Guy—walking down 10th Street.   (D.I. 47-3 at 73-
76)   Gardner told the jury that she knew Petitioner because he had grown up in the
neighborhood and had gone to school with her children.   (D.I. 47-3 at 73)   Gardner
testified that she observed Petitioner and his companion approach another man who
was sitting in the driver's seat of a vehicle that was parked directly in front of her house.
(D.I. 47-3 at 74)   According to Gardner, after the three men conversed briefly, Guy got
into the right front passenger seat of the vehicle and Petitioner got into the right rear
passenger seat.   (D.I. 47-3 at 74)   Gardner testified that moments after the two men
entered the vehicle the vehicle's windows "erupted." (D.I. 47-3 at 74)   Shocked by the
explosion, Gardner said, she immediately "grabbed [her] grandson" and ran to her

---

[11]At the risk of being repetitive, the Court again notes that, at trial, Fields testified that,
while they were both at the same prison, Petitioner told him that he unintentionally killed
Francis and Guy with a MAC-10 in a robbery or drug deal that went wrong and that
"[s]ome lady named April" witnessed the shooting. (D.I. 47-3 at 85-89)   Fields also
testified that he saw Petitioner accidentally fire a MAC-10 at 930 Spruce Street a few
months before Francis and Guy were killed. (D.I. 47-3 at 86-88)   Coleman testified that,
while they were at the same prison, Petitioner told him that he shot Francis and Guy
from the back seat of a car with a MAC-10 in a robbery that went wrong, he disposed of
the MAC10 used in the shooting, and April Gardner had witnessed the shooting. (D.I.
47-3 at 63-67)

daughter's house around the corner where she remained for several hours before returning home. (D.I. 47-3 at 74-75)  Gardner testified that as she ran from the scene, she could feel shards of glass getting caught in her hair, and that she had "glass all in [her] hair" when she reached her daughter's house. (D.I. 47-3 at 74-75)  Gardner further testified that Washington came to her home later that evening "to apologize," but that she refused to speak to him. (D.I. 47-3 at 75-76, 81)  Gardner's testimony  inculpates Petitioner, and he cannot show that no reasonable juror would have voted to find him guilty beyond a reasonable doubt based on Waterman's post-trial recantation.  Thus, after reviewing Waterman's affidavit in context with the record, the Court concludes that Waterman's recantation does not constitute new reliable factual evidence of Petitioner's actual innocence as required by *Schlup*.

### b.  Isaiah Fields' tacit agreement

As previously explained, Fields testified that, while he and Petitioner were in the same prison, Petitioner told Fields that he unintentionally killed Francis and Guy with a MAC-10 in a robbery or drug deal that went wrong and that "[s]ome lady named April" witnessed the shooting. (D.I. 47-3 at 85-89)  Fields also testified that he saw Petitioner accidentally fire a MAC-10 at 930 Spruce Street a few months before Francis and Guy were killed. (D.I. 47-3 at 86-88)  At the time of his testimony, Fields was incarcerated and serving a five-year sentence for a first degree assault conviction.

Approximately two months after Petitioner's trial and about a month before Petitioner was sentenced, the State filed a motion to reduce Fields's sentence premised on Fields's substantial assistance with the State in Washington's case.  (D.I. 76-8 at

417-420)  The State asserted that Fields's assistance was worth one year of credit on his five-year sentence for assault.  (D.I. 76-8 at 419)  On January 18, 2011, the court granted the motion and Fields's sentence was reduced from five years to four years. (D.I. 76-8 at 421-423)

As he did in his second Rule 61 motion, Petitioner now argues that the substantial assistance motion filed by the State after Petitioner's trial, along with Fields' reduced sentence, demonstrates that the State had a tacit agreement with Fields to provide him with a benefit (reduced sentence) in exchange for his testimony.[12]  (D.I. 69 at 8-23)   Petitioner contends that the State violated *Brady* by not disclosing the agreement to him prior to trial, and that the evidence of the tacit agreement constitutes new evidence of his actual innocence, because he could have used the alleged deal between Fields and the State to impeach Fields' testimony at trial.

Petitioner's proffered evidence of a "tacit agreement" between the State and Fields does not constitute new reliable evidence of Petitioner's factual innocence.  First, the evidence is not "new" because the instant argument was available to Petitioner at the time of his direct appeal and his first Rule 61 motion, given that the substantial assistance motion was filed prior to Petitioner's direct appeal.  Second, Petitioner does not provide, and nothing in the record indicates, that there was a substantial assistance agreement between Fields and the State at the time of his testimony.  When he testified, Fields explained that he was incarcerated and serving a five-year sentence, and he testified that no agreement had been worked out in exchange for his testimony.

---

[12]Petitioner raises the issue of the alleged *Brady* violation as an independent ground for relief in Claim Twenty-One (a).

(D.I 47-3 at 85, 88)  He also responded "[y]es," when asked whether he "want[ed] to be here today" to testify. (D.I. 47-3 at 88)  On cross-examination, Fields explained that he was testifying to "help solve" the homicide and stated that he "ain't getting nothing out of it" and that he was not protecting anyone else.  (D.I. 47-3 at 90)  He asserted that he came forward to investigators because he "wanted to help the situation."  (D.I. 47-3 at 91)  Defense counsel attacked Fields's credibility on cross-examination and in closing. (D.I. 47-3 at 88-91, 292-302)

Third, prior to Fields' testimony, during discussions with the Superior Court about the relevancy of the defense's line of questioning for another witness, the State made the statement:

> Has Isaiah Field[s] asked for a break? No, he wasn't smart enough to do that beforehand. He pled to a five-year min/man, and there's not a whole lot I can do about that and I told him that.

(D.I. 47-3 at 45)  During closing arguments, the State also asserted, "Isaiah Fields, he didn't ask for a deal. He's serving 5 years for an Assault Second. Told you, 'I didn't get a deal.'" (D.I. 47-3 at 305)  In fact, Fields' former counsel provided a statement that he had "no recollection of any involvement in any substantial assistance motion for [Fields] or any request for same." (D.I. 76-8 at 428)  In sum, viewing the foregoing circumstances together demonstrates that Petitioner has failed to demonstrate the existence of a substantial assistance agreement.

Nevertheless, even if such an agreement existed at trial, Petitioner cannot show that no reasonable juror would have voted to find him guilty beyond a reasonable doubt if the existence of such an agreement had been disclosed.  At most, Petitioner's

proffered evidence of an undisclosed tacit agreement with the State would have constituted impeachment evidence that does not create a strong inference of Petitioner's actual innocence.

Thus, after reviewing Petitioner's purported evidence of a tacit agreement in context with the entire record, the Court concludes that the alleged tacit agreement does not constitute new reliable factual evidence of Petitioner's actual innocence as required by *Schlup*.

### c.  Carl Rone

Petitioner also asserts that he has established a miscarriage of justice Because "new evidence . . . proves Carl Rone's testing was insufficient, unreliable, and he shouldn't [have] been testifying as an expert witness."  (D.I. 69 at 27; D.I. 81 at 1)  In addition, Petitioner contends that Rone's arrest and conviction for theft and falsifying business records that occurred years after his 2010 trial demonstrates his actual innocence.  (D.I. 69 at 27)

Petitioner is mistaken.  To the extent Petitioner relies on Rone's misrepresentation of his credentials during the trial, and the alleged deficiency of Rone's methodology, neither constitutes *new* evidence of Petitioner's actual innocence because both issues were available at the time of Petitioner's trial.  Petitioner's reliance on Rone's arrest and conviction for theft and falsifying business records also fails to establish a claim of newly discovered evidence of Petitioner's actual innocence.  At most, Rone's misconduct and subsequent criminal convictions, which occurred years after Petitioner's 2010 trial, amount to impeachment evidence.  Rone's misconduct did

not involve the mishandling or falsification of ballistics evidence, and Petitioner has not shown that Rone mishandled or fabricated evidence in his case.

In sum, Petitioner's complaints about Rone constitute impeachment evidence that, even when viewed together, are not persuasive in light of the additional significant evidence of Petitioner's guilt. Petitioner has not shown that, in light of his "new" evidence concerning Rone, it is more likely than not that no reasonable juror would have convicted him absent the error. Consequently, the miscarriage of justice exception to the procedural default does not apply.

### d. Richardson affidavit

Finally, Petitioner has provided a February 2018 affidavit from an inmate, Jeree Richardson, to show that the shooting did not occur in front of Gardner's house. (D.I. 46 at 11; D.I. 57 at 1) In his affidavit, Richardson asserts that, on the day of the shooting, he told City Councilwoman Stephanie Bolden and two police officers that he had seen the car drive down Pine Street and turn on Tenth Street before it crashed. (D.I. 34 at 6-7, 12; D.I. 46 at 11) Richardson's affidavit does not address Petitioner's role in the homicide at all. Therefore, Richardson's affidavit does not constitute the strong evidence of actual innocence needed to demonstrate a miscarriage of justice would occur if the claim was not heard.

To summarize, Petitioner has not demonstrated cause for his default of Claims Eight, Nine, Ten (b) and (c), Twelve (a), (b), and (c), Thirteen, Fourteen (a), Sixteen, Seventeen, Eighteen, Nineteen, Twenty, Twenty-One (b), and Twenty-Two (a). Additionally, since Petitioner's attempts to demonstrate new reliable evidence of his

57

actual innocence are unsuccessful, Petitioner's default of the instant Claims cannot be excused under the miscarriage of justice exception to the procedural default doctrine. Accordingly, the Court will deny Claims Eight, Nine, Ten (b) and (c), Twelve (a), (b), and (c), Thirteen, Fourteen (a), Sixteen, Seventeen, Eighteen, Nineteen, Twenty, Twenty-One (b), and Twenty-Two (a) as procedurally barred.

## C. Procedurally Barred Prosecutorial Misconduct Claims

Petitioner presents four prosecutorial claims: Claims Two, Three (a) and (b), Five (a), and Six. In Claim Two, Petitioner contends that the State "manipulat[ed] facts and misle[d] the jury as to the conditions of [Waterman's] federal plea agreement. (D.I. 1 at 7) Claim Three asserts that the State (a) manipulated evidence and (b) improperly vouched for the State's witnesses at trial. (D.I. 1 at 8-9; D.I. 29 at 11) In Claim Five (a), Petitioner contends that the State improperly interjected information into the trial during summation regarding as to where the shooter was seated in the vehicle, which was not factually supported by the testimony of the State's ballistics expert, Rone. (D.I. 1 at 12) Finally, in Claim Six, Petitioner asserts that the State falsely told the jury during opening and closing statements that Rone would testify, and did testify, that bullets and bullet fragments recovered from the car, the victims, 930 Spruce Street, and the street in front of Gardner's house came from the same gun. (D.I. 1 at 14; D.I. 29 at 11)

Petitioner presented Claims Two, Three (a), Five (a) , and Six to the Superior Court in his first Rule 61 motion, and then to the Delaware Supreme Court on appeal from the denial of that Rule 61 motion. (D.I. 47-6 at 19-26, 34-44) The Delaware

Supreme Court denied Claims Two, Three (a), Five (a), and Six as barred under Rule 61(i)(3).

Petitioner presented Claim Three (b) for the first time to the Delaware Supreme Court on post-conviction appeal. As a result, the Delaware Supreme Court only reviewed Claim Three (b) for plain error under Delaware Supreme Court Rule 8.

By applying the procedural bars of Rule 8 and Rule 61(i)(3), the Delaware Supreme Court articulated a "plain statement" under *Harris v. Reed* that its decision rested on state law grounds. . *See Harris*, 489 U.S. at 263-64. This Court has consistently held that Rule 8 and Rule 61(i)(3) are independent and adequate state procedural rules effectuating a procedural default. *See Harris,* 489 U.S. at 263-64; *DeAngelo v. Johnson*, 2014 WL 4079357, at \*12 (D. Del. Aug. 15, 2014); *Lawrie v. Snyder*, 9 F. Supp. 2d 428, 451 (D. Del. 1998). Therefore, the Court cannot review the merits of Claims Two, Three (a) and (b), Five (a), and Six absent a showing of cause for the default, and prejudice resulting therefrom, or upon a showing that a miscarriage of justice will occur if the claim is not reviewed.

Petitioner does not allege any cause for his default of Claim Six. He does, however, assert ineffective assistance of defense counsel as cause for his default of Claims Two, Three (a), (b), and Five (a). Ineffective assistance provided by a trial attorney can constitute cause for a procedural default if the particular ineffective assistance allegation was presented to the state courts as an independent claim and it was determined that the attorney's error amounted to constitutionally ineffective assistance. *See Murray*, 477 U.S. at 488-89. An ineffective assistance of trial counsel

claim cannot constitute cause if the claim itself is procedurally defaulted. *See Edwards*, 529 U.S. at 451-5.

Here, Petitioner did not fairly present his ineffective assistance of counsel claims related to the prosecutorial misconduct alleged in Claims Two and Three (a) and (b) to the Delaware Supreme Court on post-conviction appeal. Therefore, these instant ineffective assistance of counsel allegations are themselves defaulted and cannot excuse Petitioner's default of Claims Two and Three (a) and (b).

In Claim Five (a), Petitioner argues that the State misstated the evidence by telling the jury during summation: (1) that Gardner testified that Petitioner got into the back seat of the passenger side seat of the car moments before the car windows erupted; and (2) that Rone testified that, if more than one person had been present in the back seat of the car, that person would have been shot. (D.I. 1 at 12) Petitioner fairly presented his allegation that defense counsel provided ineffective assistance by failing to object to the prosecutorial misconduct asserted in Claim Five (a) to the Delaware Supreme Court on post-conviction appeal, but the Delaware Supreme Court held that defense counsel did not provide constitutionally ineffective assistance by failing to object to the State's assertion concerning the location of the shooter in the car. As explained in its discussion of Claim Five (b), the Court concludes that the Delaware Supreme Court reasonably applied *Strickland* in holding that defense counsel did not provide constitutionally ineffective assistance by failing to object the prosecutorial misconduct alleged in Claim Five (a). *See supra* at Section III.A.2. Therefore, defense counsel's action do not constitute cause for Petitioner's default of Claim Five (a).

In the absence of cause, the Court will not address the issue of prejudice. Moreover, Petitioner's default of the instant Claims cannot be excused under AEDPA's miscarriage of justice exception because, as previously explained, Petitioner has failed to provide new reliable evidence of his actual innocence. *See supra* at Sections III.A.1, III.B.2, III.B.4 and n.11. Accordingly, the Court will deny Claims Two, Three (a), (b), Five (a) and Six as procedurally barred.

### D. Claim Twenty-One (a): *Brady* Violation

In January 2011, two months after the conclusion of Petitioner's trial but before his sentencing, the State filed, and was granted, a motion to reduce Fields' sentence based on Fields' substantial assistance in prosecuting Petitioner. Petitioner asserts that the State's act of filing the motion to reduce Fields' sentence is evidence that an undisclosed tacit agreement between Fields and the State existed at the time of his trial. (D.I. 69 at 8-23) Thus, in Claim Twenty-One (a), Petitioner contends that the State violated *Brady* by failing to disclose that Isaiah Fields was the beneficiary of a tacit sentence reduction agreement, and that . (D.I. 69 at 13-16) He contends that he could have used the alleged deal between Fields and the State to impeach Fields' testimony at trial. (D.I. 69 at 19; D.I. 76-9 at 35-40)

Petitioner presented this argument to the Superior Court in his second Rule 61 motion. (D.I. 76-9 at 35-40) The Superior Court denied Petitioner's *Brady* claim as barred under Rule 61(i)(1) for being untimely, under Rule 61(i)(2) for being successive, and under Rule 61(i)(3) for being procedurally defaulted because Petitioner did not raise the issue during the trial. *See Washington*, 2021 WL 5232259, at *5-6. The Delaware

Supreme Court affirmed the Superior Court's decision "on the basis of and for the reasons assigned in the Superior Court's November 9, 2012 order denying [Petitioner's] second motion for postconviction relief." *See Washington*, 2022 WL 1041267, at \*1.

By applying the procedural bars of Rule 61(i)(1), (2), and (3), the Delaware state courts articulated a "plain statement" under *Harris v. Reed* that its decision rested on state law grounds. *See Harris*, 489 U.S. at 263-64. This Court has consistently held that Rule 61(i)(1) and (3) are independent and adequate state procedural rules effectuating a procedural default, and recently confirmed that the version of Rule 61(i)(2) applied to Petitioner's second Rule 61 motion also constitutes an independent and adequate state procedural rule effectuating a procedural default.[13]   *See Stanford v. Akinbayo*, 2021 WL 4263045, at \*9 (D. Del. Sept. 20, 2021) ("[T]his Court has consistently held that Rule 61(i)(1) and (3) are independent and adequate state procedural rules."); *Taylor v. May*, 2022 WL 980859, at \*16-21 (D. Del. Mar. 31, 2022) (holding that, as applied to Taylor's case, the post-2014 version of Rule 61(i)(2) was an independent and adequate state procedural rule). Therefore, the Court cannot review the merits of Claim Twenty-One (a) absent a showing of cause for the default, and prejudice resulting therefrom, or upon a showing that a miscarriage of justice will occur if the claim is not reviewed.

---

[13]The version of Rule 61(i)(2) that the Superior Court applied to Petitioner's case became effective in June 2014. Although Petitioner filed his initial first Rule 61 motion in 2012, he was still amending that Rule 61 motion up until March 28, 2016. (*See* D.I. 47-1 at Entry No. 140) Since Petitioner had notice of the precise parameters of the successive bars under the post-2014 version of Rule 61(i)(2) while his first Rule 61 motion was still being briefed and amended the Court concludes that the post-2014 version of Rule 61(i)(2) constituted an independent and adequate state procedural rule as applied to his case.

In *Brady v. Maryland*, the Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87.  This "duty to disclose such evidence is applicable even though there has been no request by the accused," and includes "impeachment evidence as well as exculpatory evidence." *Strickler v. Greene*, 527 U.S. 263, 280 (1999).  "Such evidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id*.  "In order to comply with *Brady*, therefore, the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in this case, including the police." *Id*. at 281 (cleaned up).  "There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued [*i.e.*, the evidence was material]." *Id*. at 281-82.  Evidence is material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S.667, 682 (1985).  "A 'reasonable probability' of a different result is accordingly shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" *Kyles v. Whitley*, 514 U.S. 419, 434 (1995).

In the context of procedural default, "cause and prejudice parallel two of the three components of the alleged *Brady* violation itself." *Strickler*, 527 U.S. at 282. The suppression by the prosecution of evidence favorable to the accused provides cause to excuse the petitioner's procedural default, but unless the evidence is "material" under *Brady*, the petitioner is unable to demonstrate "sufficient prejudice to overcome the procedural default." *Id.* Therefore, if Petitioner establishes that the State suppressed evidence and that the evidence was material, he will also establish cause and prejudice to excuse his procedural default of Claim Twenty-One (a).

As the Court has previously discussed at length with respect to Petitioner's actual innocence argument, Petitioner has not established that the State suppressed evidence of a tacit agreement with Fields, primarily because there is no evidence that such an agreement existed. *See supra* Section III.B.4; *see also Washington*, 2021 WL 5232259, at *7, *aff'd*, 2022 WL 1041267, at *1.

Furthermore, even if Petitioner's allegation that a tacit agreement existed were true, he has failed to demonstrate its materiality. As the Third Circuit has noted:

> The materiality of *Brady* material depends almost entirely on the value of the evidence relative to the other evidence mustered by the state. Suppressed evidence that would be cumulative of other evidence or would be used to impeach testimony of a witness whose account is strongly corroborated is generally not considered material for *Brady* purposes. Conversely, however, undisclosed evidence that would seriously undermine the testimony of a key witness may be considered material when it relates to an essential issue or the testimony lacks strong corroboration.

*Johnson v. Folino*, 705 F.3d 117, 129 (3d Cir. 2013) (cleaned up).

Notably, there was additional significant evidence of Petitioner's guilt, which included Gardner's eyewitness testimony and Coleman's testimony that Petitioner admitted to killing Francis and Guy.  *See Washington*, 2021 WL 5232259, at *7, *aff'd*, 2022 WL 1041267, at *1; *see also supra* at Sections III.A.1, III.B.2, III.B.4, and n.11. Thus, even if an agreement existed between the State and Fields, Petitioner cannot show a reasonable probability that the result of the proceeding would have been different if the existence of the agreement had been disclose, or that its disclosure would probably change the result if a new trial was granted.

In sum, Petitioner has failed to establish cause for his procedural default because he can show neither that the State suppressed evidence, nor that the evidence was material.

To the extent Petitioner asserts that his failure to raise Claim Twenty-One (a) earlier should be excused because it was due to the ineffective assistance of trial and/or appellate counsel, his contention is unavailing.  (*See* D.I. 69 at 8-23; D.I. 72)  Claims of ineffective assistance of counsel cannot establish cause for a procedural default unless they were first presented to the state courts as an independent claim, and Petitioner did not present this particular ineffective assistance of trial and/or appellate counsel claim to the State courts.  Similarly, to the extent Petitioner may be attempting to invoke *Martinez* to establish cause for his default by claiming that his postconviction counsel was ineffective for failing to raise this Claim, the argument fails.  (*See* D.I. 69 at 16, 20-23)  The limited exception articulated in *Martinez* only applies where the underlying claim is one of ineffective assistance of trial counsel. *See Davila*, 137 S. Ct. at 2062.

Consequently, Petitioner cannot invoke *Martinez* to establish cause for the procedural default of the instant freestanding *Brady* claim or any claim that *appellate* counsel was ineffective.

Petitioner does not allege any other cause for his procedural default of Claim Twenty-One (a).  In the  absence of cause, the Court need not address the issue of prejudice.  Moreover, Petitioner's default of the instant Claim cannot be excused under AEDPA's miscarriage of justice exception because, as previously explained, Petitioner has failed to provide new reliable evidence of his actual innocence.  *See supra* at Section III.B.4.  Accordingly, the Court will deny Claim Twenty-One (a) as procedurally barred.

### E.  Procedurally Defaulted Claims Alleging Trial Court Error

Petitioner asserts three Claims alleging that the Superior Court erred and/or abused its discretion during his trial:  Claims Four, Seven (a), and Fourteen (b).  In Claim Four, Petitioner contends that the Superior Court committed plain error by permitting Detective Ciritella to testify as an expert.  Claim Seven (a) asserts that the Superior Court abused its discretion by dismissing Carl Rone, the State's ballistics expert, before Petitioner had the opportunity to view the vehicle involved in the incident and cross-examine Rone.  In Claim Fourteen (b), Petitioner asserts that the Superior Court erred by not inquiring into the conflict of interest between defense counsel and the prosecutor.

Petitioner presented Claims Four and Seven (a) to the Delaware Supreme Court on appeal from the denial of his first Rule 61 motion.  The Delaware Supreme Court

denied the Claims as procedurally barred under Rule 61(i)(3), and also denied a portion of Claim Seven (a) under Delaware Supreme Court Rule 8.  Rule 8 and Rule 61(i)(3) constitute and independent and adequate state law grounds.  Therefore, the Court cannot review the merits of the Claims absent a showing of cause and prejudice, or a miscarriage of justice.

Petitioner did not present Claim Fourteen (b) to the Delaware Supreme Court on post-conviction appeal.  At this juncture, Rule 61(i), (ii), and (iii) would prevent Petitioner from presenting Claim Fourteen (b) in a new Rule 61 motion. Therefore, the Court must treat Claim Fourteen (b) as procedurally defaulted, which means that it cannot review its merits absent a showing of cause and prejudice, or a miscarriage of justice.

Petitioner attempts to establish cause by blaming defense counsel for not raising the instant Claims during trial.  As discussed in its discussion of Claim Seven (b), the Court concludes that defense counsel did not perform ineffectively by not objecting when the Superior Court dismissed Carl Rone, the State's ballistics expert, before Petitioner had the opportunity to view the vehicle involved in the incident and cross-examine Rone (Claim Seven (b).  *See supra* at Section III.A.3.  Therefore, defense counsel's actions cannot excuse Petitioner's default of Claim Seven (a).  As for Claims Four and Fourteen (b), defense counsel's failure to raise these Claims cannot excuse Petitioner's default because, as discussed above, the related claims of ineffective assistance (Claims Twelve (c) and Fourteen (a)) are themselves procedurally defaulted.

In the absence of cause, the Court will not address the issue of prejudice.  In addition, the miscarriage of justice exception to the procedural default does not excuse

Petitioner's default because, as discussed above, he has not presented new reliable evidence of his actual innocence.  Accordingly, the Court will deny Claims Four, Seven (a), and Fourteen (b) as procedurally barred.

### F. Ineffective Assistance of Post-Conviction Counsel

Petitioner presents three Claims alleging that post-conviction counsel provided ineffective assistance.  In Claim Fifteen, he asserts that post-conviction counsel provided ineffective assistance by: (1) failing to investigate beyond the trial record and prove his innocence; (2) failing to provide an investigator to prove his innocence; (3) failing to advise Petitioner about the standard for relief under Rule 61; and (4) moving to withdraw.  In Claim Twenty-One (c), Petitioner contends that post-conviction counsel provided ineffective assistance by failing to raise the Brady Claim in his Rule 61 motion. In Claim Twenty-Two (b), Petitioner contends that post-conviction counsel provided ineffective assistance by failing to investigate and raise the issue of defense counsel's ineffective assistance with respect to Carl Rone.

There is no federal constitutional right to effective assistance of post-conviction counsel. *See Coleman*, 501 U.S. at 752.  In fact, the AEDPA specifically provides that "the ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding under section 2254." 28 U.S.C. § 2254(i). Therefore, the Court will deny Claims Fifteen, Twenty-One (c ), and Twenty-Two (b) because they do not assert an issue cognizable on federal habeas review.  *See, e.g., Jordan v. Sup't Somerset SCI*, 2017 WL 5564555, at *1 (3d

Cir. Feb. 15, 2017) ("[C]laims alleging ineffective assistance of PCRA counsel are non-cognizable in federal habeas, 28 U.S.C. § 2254(i).").

### G. Claim Twenty-Three: Actual Innocence

In his final Claim, Petitioner appears to assert a freestanding claim of actual innocence based on his alleged "new" evidence of Waterman's recantation, Fields' allegedly undisclosed "tacit" sentence reduction agreement, and Rone's qualifications and methodology.

Whether or not a freestanding claim of actual innocence is cognizable on federal habeas review remains an open question in Supreme Court jurisprudence. *See McQuiggin*, 569 U.S. at 392; *Reeves v. Fayette SCI*, 897 F.3d 154, 160 n.4 (3d Cir. 2018). Assuming, *arguendo*, that a free-standing claim of actual innocence is cognizable, a petitioner's burden on any such claim "would necessarily be extraordinarily high" and "more demanding" than that applied to gateway actual-innocence claims. *Herrera v. Collins*, 506 U.S. 390, 416 (1993); *see also Reeves*, 897 F.3d at 160 n.4 (describing hypothetical freestanding actual-innocence standard as "more demanding" than that applied to gateway actual-innocence claims). To put Petitioners' burden of establishing a free-standing claim of actual innocence in perspective, a gateway actual innocence claim that is asserted in an effort to overcome a procedural bar for habeas cases will only prevail if it is based on "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence [ ] that was not presented at trial." *Schlup*, 513 U.S. at 324. The Court has already concluded that Petitioner's new evidence of

Waterman's recantation, Fields' alleged tacit sentence reduction agreement, and the issues surrounding Rone's qualifications and methodology does not satisfy the *Schlup* standard. *See supra* at Section III.B.4. Thus, on the facts presented, Petitioner's assertion of actual innocence does not provide a basis for relief under § 2254.

### H. Pending Motions

Petitioner has filed a Motion for an Evidentiary Hearing (D.I. 67), a Motion for the Appointment of Counsel (D.I. 68), and a Motion for both the Appointment of Counsel and an Evidentiary Hearing (D.I. 70)  In light of the Court's decision that the Petition should be denied, the Court will dismiss Petitioner's requests for the appointment of counsel as moot.

Turning to Petitioner's request for an evidentiary hearing, Petitioner appears to assert that an evidentiary hearing is warranted because he is *pro se* and had "no counsel on his direct appeal and first round of collateral proceedings." (D.I. 67 at 8)  To support his request, Petitioner merely sets forth a detailed history of his proceedings in the state courts. (D.I. 67)

A federal habeas petitioner is not entitled to an evidentiary hearing in most cases. The Supreme Court has explained that "[a]lthough state prisoners may sometimes submit new evidence in federal court, AEDPA's statutory scheme is designed to strongly discourage them from doing so." *Cullen v. Pinholster*, 563 U.S. 170, 185-86 (2011).  Typically, requests for an evidentiary hearing in a federal habeas proceeding are evaluated under 28 U.S.C. § 2254(e)(2), which provides:

70

(2) If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that

(A) the claim relies on –
(i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
(ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2).

"At a minimum, . . . § 2254(e)(2) still restricts the discretion of federal habeas courts to consider new evidence when deciding claims that were not adjudicated on the merits in state court." *Cullen*, 563 U.S. at 186; *see also Schriro v. Landrigan*, 550 U.S.465, 468 (2007) ("In cases where an applicant for federal habeas relief is not barred from obtaining an evidentiary hearing by 28 U.S.C. § 2254(e)(2), the decision to grant such a hearing rests in the discretion of the district court."); Rule 8 of the Rules Governing Section 2254 Cases in the United States District Courts, 28 U.S.C. foll. § 2254. When deciding whether to grant a hearing, the "court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations," taking into consideration the "deferential standards prescribed by 28 U.S.C. § 2254."

71

*Schriro*, 550 U.S. at 474.  An evidentiary hearing is not necessary if the issues can be resolved by reference to the record developed in the state courts.  *Id.*

The Court has determined that Petitioner's Claims are meritless, procedurally barred, and/or not cognizable.  Petitioner's assertions do not demonstrate how a hearing would advance his arguments.  Therefore, the Court will deny Petitioner's request for an evidentiary hearing

## IV.   CERTIFICATE OF APPEALABILITY

The Court must decide whether to issue a certificate of appealabilty.  *See* 3d Cir. L.A.R. 22.2 (2011).  A certificate of appealability is appropriate when a petitioner makes a "substantial showing of the denial of a constitutional right" by demonstrating "that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  28 U.S.C. § 2253(c)(2); *see also Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Additionally, if a federal court denies a habeas petition on procedural grounds without reaching the underlying constitutional claims, the court is not required to issue a certificate of appealability unless the petitioner demonstrates that jurists of reason would find debatable: (1) whether the petition states a valid claim of the denial of a constitutional right; and (2) whether the court was correct in its procedural ruling.  *See Slack,* 529 U.S. at 484.

The Court has concluded that the instant Petition fails to warrant federal habeas relief.  Reasonable jurists would not find this conclusion to be debatable.  Accordingly, the Court will not issue a certificate of appealability.

## V.    CONCLUSION

For the reasons discussed above, the Court will deny the instant Petition without an evidentiary hearing.

The Court will issue an Order consistent with this Memorandum Opinion.